Commonwealth *v.* Wink, Appellant.

Argued October 4, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Lemuel B. Schofield,* with him *Thomas D. McBride, Fred I. Noch* and *Michael von Moschzisker,* for appellant.

*Carl A. Niehoff,* District Attorney, for appellee.

OPINION BY ARNOLD, J., November 15, 1951:

Defendant appeals from convictions of consensual rape and contributing to the delinquency of a minor child. The jury's verdict established the following facts:

The defendant, about forty years of age, conducted an undertaking establishment in the borough of Weissport, Carbon County. He was successful and had a good income. Married and with one daughter, he and his family lived in the same building where he conducted his business.

Jean Fairchild was born September 13, 1934. Wink became interested in her, and while she was under sixteen engaged her as a baby sitter in his home. He was very kind to her, paid her liberally, bought clothes

for her, and permitted her to have various articles of wearing apparel charged to him. He prevented her getting regular employment with others by telling them false stories about her. On one occasion she left home to take an out of town job, and he induced officers to bring her back to Weissport. The stories which he told about her to the officers and prospective employers were undoubtedly not true, because the record discloses two letters[1] from Wink to the girl's parents, declaring his affection for her, and extolling her good character and truthfulness. He also prepared a letter[2] addressed to the probation officer of Carbon County, which he induced this girl to sign (the context of which shows that it was not composed by her). The tenor of it was that her mother did not treat her right, that the Winks were her firm friends, that she wanted to live with them, and that it was a fine opportunity for her. Thus he succeeded in making her dependent on him. At one stage of the defendant's relations with this girl he offered her father $1,700 if he and his wife would consent to the child being adopted by the Winks. In that way she would become a permanent member of the family and directly under his control.

Without any doubt the evidence discloses that the defendant was an aggressive egoist, possessed of a great amount of cunning, craftiness, and stealth, which he utilized to have his way with this child.[3] The record

[1] Commonwealth's Exhibit 3-a (290a); Commonwealth's Exhibit 4-a (294a).

[2] Commonwealth's Exhibit 2-a (288a).

[3] Defendant's application for a supersedeas (which we refused) disclosed that Roy W. Goshorn, M. D., of the Eastern State Penitentiary, gave the opinion that Wink was "a dangerous man as his entire pattern of life is one in which he is entirely after the young girls. I certainly would not trust this man under any condition." Likewise, J. D. Shearer, Chairman of Classification of the peni-

is replete with evidence that the defendant was not only jealous of her, but that he would brook no interference with his plans. In addition to his intractability he was much overweight and suffered from hypertension.

On June 30, 1950, and at various times thereafter into the month of September, the defendant had intercourse with this child. The testimony offered against him was wholly uncontradicted, and scarcely anyone could fail to believe that the defendant committed the felony charged.

For more than four hours the victim was put through a rigorous cross-examination covering 143 *printed* pages of the record. The purpose of the cross-examination was to show (a) that she was a trollop; (b) that she was a prevaricator; and (c) that the defendant was a very sick man. In numerous instances she was challenged concerning alleged false statements made to others. These she denied, and the defendant called no witnesses to contradict her.[4] He did not testify. It was claimed that the proximity of Mrs. Wink's bedroom to that of the girl made it impossible that defendant's intercourse with this girl could be had without Mrs. Wink's knowledge. Mrs. Wink was not called as a witness. Repeatedly the cross-examiner referred to

tentiary, declared that he was potentially dangerous, and "I am of the opinion that Mr. Wink is intelligent and cunning enough to behave himself while his case is being appealed . . ."

[4] For instance, the defendant offered to prove, but did not, that the girl had falsely accused Emil Fuchich of committing rape upon her. The girl denied this, and again the defendant offered no evidence to contradict. The cross-examination kept bringing in names of the girl's youthful male friends without showing anything relevant or pertinent to the issue. Repeatedly she was charged with having disliked her mother and accused her of mistreatment, and it was stated that her mother wanted her to be kept with the Winks to keep her out of trouble. Again her denial was uncontradicted.

the ill health of the defendant, but never offered any evidence, and, as later appears herein, his ill health was far from being as bad as claimed.

It is said that this child was unworthy of belief because the jury rejected her testimony that he threatened her with a revolver and forced her to commit the first act of intercourse with him. Anyone familiar with the trial of consensual rape cases knows that in practically every instance the girl alleges the use of force, and the argument for the defendant always has been that she was false in this and must be considered false in all. Rarely has a jury failed to understand the very common and natural idea of the girl to rationalize her own misconduct by the claim that force was used. She tries to save her face. As usual, the jury here had no difficulty with the question of her credibility in this or the other matters which are claimed to affect it. The defendant himself, in the letters above referred to, attested to her veracity. The trial judge affirmed the defendant's point for charge that "Testimony of a victim in a sex offense such as this where it appears that conflicting statements are made by . . . [her] and where it appears that her story is hard to believe should be scrutinized closely by the jury and received with care." There was no evidence of any improper motive for the accusation which resulted in this prosecution. Neither the court below nor this Court would be justified in setting aside this conviction on any question of credibility.

In the course of the trial, defendant's counsel on cross-examination got her to admit that she had had intercourse before her relations with Wink. The cross-examination was not admissible, for it is the repute of the girl which constitutes a defense to the felony, and not her acts: *Commonwealth v. Stewart*, 110 Pa. Superior Ct. 279, 168 A. 528. Appellant offers the novel argument that the girl's testimony of itself established her ill repute. This is not so. On the other hand, the

defendant's own declarations in his letters to her parents affirmatively showed that *he* had not considered her of ill repute.

It is argued that the statute ought to be read as though bad character were a defense, assuming that the testimony comes from the girl herself. With this we disagree. A long line of cases has held that the question is what she is reputed to be, not what she actually is.[5] Under The Penal Code of 1860 the age of consent was ten years. Under the amendment of 1887, P. L. 128, the age of consent was raised to sixteen years, but the felony would be reduced to a misdemeanor if the girl was of ill repute. With full knowledge that only ill repute, and not bad character, was a defense to the felony, The Penal Code of 1939, P. L. 872, 18 PS §4721, followed in this regard precisely the language of the amendment of 1887 to the Code of 1860. Section 52 of the Statutory Construction Act, 46 PS §552, provides that ". . . when a court of last resort has construed the language used in a law, the Legislature in subsequent laws on the same subject matter intend the same construction to be placed upon such language; . . ."[6] The trial judge correctly charged that there was no evidence of ill repute.

We reject appellant's contention that redirect examination of the chief of police was improperly permitted. He was the official prosecutor. By cross-examination the defendant sought to show that he was actuated by malice because the defendant, when a member of the borough council, voted him only a $5.00 raise instead of a requested $10.00. On redirect examination

---

[5] *Commonwealth v. Howe*, 35 Pa. Superior Ct. 554; *Commonwealth v. Stewart*, 110 Pa. Superior Ct. 279, 168 A. 528. See also *Commonwealth v. Emery*, 51 Pa. Superior Ct. 55; *Commonwealth v. Kester*, 58 Pa. Superior Ct. 509, and *Commonwealth v. San Juan et al.*, 129 Pa. Superior Ct. 179, 195 A. 433.

[6] Even without the statute this was the decisional law.

the chief testified to matters which would have been competent even without cross-examination: that the defendant had followed a young man named Sterling from the girl's home, and that he had received other complaints against the defendant. Not only was the evidence competent, but it was particularly admissible because of the cross-examination seeking to fasten malice upon him.

Defendant was also convicted of contributing to the delinquency of a minor child, Jean Fairchild, under §20 of The Juvenile Court Law, 11 PS §262, which reads: "Any person who contributes to the delinquency of any child *to whom the jurisdiction of any juvenile court* within this Commonwealth *has attached, or shall hereafter attach,* . . . shall be guilty . . . [etc.]."[7] (Italics supplied). This judgment must be reversed since the jurisdiction of the juvenile court had not attached at any time before verdict. See *Commonwealth v. Jordan,* 136 Pa. Superior Ct. 242, 7 A. 2d 523. The appellee cites *Commonwealth v. Sarricks,* 161 Pa. Superior Ct. 577, 56 A. 2d 323; but that conviction was under The Juvenile Court Law of Allegheny County, under which the jurisdiction of the juvenile court need not attach except when it is charged that the defendant induced the child to violate an order of court.

The question that the juvenile court's jurisdiction had not attached was first raised on a demurrer to the evidence, and not on a motion to quash or objection to any of the evidence. Therefore, in the present appeal, it is not and could not properly be contended that a reversal on the felony should be had because of any evidence admitted on the misdemeanor count. In ad-

---

[7] The jurisdiction of the juvenile court attaches to the child, under §4, as amended, 11 PS §246, upon "petition of any citizen, resident of the county . . .", or "commitment, by a magistrate, alderman or justice of the peace . . ."

dition, as to the felony the evidence was competent as bearing on the defendant's intent, purpose and state of mind.

The remaining question must be considered at some length. On January 3, 1951, a true bill was returned against the defendant.

On January 8, 1951, defendant moved for a continuance on the ground of alleged ill health, and the court continued the case to January 15.

On January 9, defendant applied for a continuance on the ground of adverse publicity, but was refused. On the same day the defendant also petitioned for a change of venue, which was likewise refused.

On January 15, the date set for trial, defendant's counsel, *at side bar,* renewed the motion for a continuance, which was denied, and the trial began on the same day.

On January 16, during the cross-examination of Jean Fairchild, defendant's counsel, *at side bar,* made another motion for a continuance for 24 hours. The allegation was that the defendant had suffered a heart attack in the office of one of his counsel, and had been given morphine. The defendant had previously been examined by Dr. Sofranko. On another examination the doctor reported that he was coherent and answered all questions promptly and intelligently, and was able to attend court.

Later on January 16 defendant's counsel, *in the presence of the jury,* stated that the defendant "says he isn't feeling too well," and asked for Dr. Sofranko; but when Dr. Sofranko appeared Wink would not submit himself for examination or treatment, and counsel then stated that he was able to proceed.

On the morning of January 17, when the court convened with the jury in place, defendant's counsel stated *in the presence of the jury* that he was "informed that Mr. Wink suffered *another* attack and is presently in

the Allentown General Hospital in an oxygen tent, that he is under the care of Drs. Gregory and Turnbach, and that they refuse to permit him to come to Court because of his condition." (Italics supplied). The statement showed that the defendant had departed the jurisdiction of the court without leave. The trial judge,. having been forewarned, had made an investigation which disclosed that no physician had directed that Wink be hospitalized; that his entry was entirely voluntary; and that there was no evidence of any heart attack except the self-serving declarations of Wink. The investigation by the court will hereinafter be discussed in detail. It is. sufficient now to say that none of the findings by the court on this matter are controverted. The court then forfeited Wink's recognizance, a bench warrant apparently was issued thereafter, and the court was recessed for 24 hours.

On January 18, defendant's counsel, *outside the hearing of the jury,* reported to the court that Dr. Turnbach was *not* prepared to say that Wink was suffering from a recent heart attack, but that he had a heart condition. The court then read into the record (outside the hearing of the jury) the report of Dr. Turnbach that Wink entered the hospital at 11:45 p.m., complaining of chest pain and numbness in his arms; that it was not possible to make a diagnosis of any recent heart attack; but that it was advisible to keep him under observation in bed until a definite diagnosis could be made. As will hereinafter appear, the hospital authorities themselves asked the court to remove Wink from the hospital because he would not submit to the tests. We incorporate herein the statement of the court concerning this, the italics being our own:

"January 5, 1951, while Dr. Sofranko was making a cardiac test of the Defendant at his office in East Mauch Chunk, the Defendant informed Dr. Sofranko *that he would appear in Court when he was fit and*

*would not attend Court if he was unwell.* Dr. Sofranko passed this information to the Trial Judge, and with the knowledge of the Defendant's statements as to his appearance in Court, when the Defendant became ill in the office of Albert H. Heimbach, Esquire, the Trial Judge immediately sought the services of Dr. Sofranko for a physical and cardiac examination, and, after being informed by Dr. Sofranko that the Defendant was physically able enough to continue with the trial, the Trial Judge concluded that the Defendant was malingering, for the purpose of delaying the trial of the case and obstructing the administration of justice, and the trial was resumed at 1:30 o'clock p. m., January 16, 1951.

"On the night of January 16, 1951, that the Defendant was supposed to have been stricken with a heart attack, he rode, on a hearse to Allentown, in company with Undertaker Nathan Melber, for the purpose of returning a corpse to Carbon County, and, while in Allentown, *without a certificate of admission from a physician,* he entered Allentown General Hospital shortly before midnight.

"On the morning of January 17, 1951, Counsel for the Defendant informed the Court that the Defendant had taken a heart attack *at his home in Weissport and his physician had ordered him to Allentown General Hospital.* The Court considered the inconsistencies of the statement of Counsel, with the facts as given to the Trial Judge, and after verifying the facts under which the Defendant entered Allentown General Hospital, and being of the opinion that the Defendant was malingering and concluding that the Defendant was attempting to delay the trial of his case, the Trial Judge . . . forfeited the recognizance, and continued the case until January 18, 1951 . . . .

"By agreement, entered into between Dr. Sofranko and Dr. Robert Turnbach, of Allentown General Hos-

pital, tests were to be given the Defendant at Allentown General Hospital by Dr. Sofranko and Dr. Turnbach, for the purpose of determining whether or not the Defendant was physically unable to appear in Court. In order to complete these tests, the Court continued the hearing until January 18, 1951, at 10:00 o'clock a. m.

"*At about 3:40 o'clock p. m., January 17,* 1951, Dr. Turnbach called the Trial Judge and informed him that *the Defendant would not co-operate in the giving of tests to determine his heart condition,* that he threatened to leave the Hospital by force, *and requested the Trial Judge to have the Defendant removed from the Hospital at once.* The Defendant was removed to the Carbon County Jail, where he was given further examination by Dr. Sofranko, and Dr. Sofranko advised the Trial Judge that the defendant was physically fit to appear in Court on Monday, January 22, 1951. *The trial resumed* on January 22, 1951, and the Defendant *remained in Court* during the trial and until the time of his conviction on the night of the same date. Thereafter, the Court remitted the . . . [forfeiture]."

No one disagrees with those facts. In the original statement the defendant's counsel did not declare by whom he had been informed. Neither in a motion for a new trial nor by any motion for reargument after the court's opinion was filed did the defendant question the findings or file affidavits contra.

It is now suggested that the defendant ought to have had an opportunity to prove his assertions. For the reasons we have stated it is clear that they could not have been proved. For certainly if the judge had been in error, something would have been filed to deny the findings. Thus the court determined correctly the defendant's state of health, and that he was malingering to secure delay.

The contention of the appellant comes to this: it is not denied that the court's findings were correct, and that its actions were proper, but it is said that he should not have acted in the presence of the jury. This overlooks the fact that the statement of defendant's counsel was made in the presence of the jury, and recited a heart seizure and an inability to come to court. This was not correct, and also differed materially from that which counsel had given to the trial judge outside the presence of the jury. Under the peculiar facts of this case, especially the deliberate attempts to secure the pity of the jury, the trial judge cannot be condemned for answering the defendant's statement in exactly the same place where it was made. We are not impressed by the assertion on appeal that the trial judge had directed defendant's counsel to make any motion in open court. The record does not so show. But even if it is so, counsel fully understood the difference between a motion made in open court and a motion in open court outside the hearing of the jury.

The defendant's conduct in entering the Allentown General Hospital was in conformity with his declaration made on January 5 to Dr. Sofranko, that he would appear in court when he was fit and would not attend court if he was unwell. This, in turn, was but the same pattern of conduct as existed before and during trial: that is, that he was scheming, cunning and intractable, and that he would brook no interference with his plans, —i.e. that he was an aggressive egoist.

In the argument it is stated that the trial of a criminal case is not a game. With this we fully agree, but it ought to be added that this also applies to the defendant. The trial judge was most meticulous in guarding every right of the defendant and not injecting his views into the trial. As an example, when defendant's counsel cross-examined Jean Fairchild as to her prior unchastity, the court did not of its own motion exclude

the testimony, although he very well might have done so.

The judgment of the lower court as to rape is affirmed.

The verdict and sentence on the charge of contributing to the delinquency of a minor child is set aside.