Commonwealth *v.* Randall et al., Appellants.

604

Argued March 11, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Herbert Fishbone,* with him *David H. Miller,* and *Justin D. Jirolanio,* for appellants.

*B. V. O'Hare, Jr.,* Assistant District Attorney, with him *Clinton Budd Palmer,* District Attorney, for appellee.

OPINION BY ERVIN, J., June 11, 1957:

Defendant, Robert Randall, was found guilty under the Act of June 3, 1953, P. L. 277, §1, 18 PS §4532, which provides: "Whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years . . . is guilty of a misdemeanor. . . ." Defendants, Robert Randall and Sophie Wofsy, were also found guilty of violating Paragraph 1, §493, of the Liquor Code, 47 PS §4-493, which provides: "It shall be unlawful (1) For any licensee or the board, or any employe, servant or agent of such licensee or of the board, or any other person, to sell, furnish or give any liquor or malt or brewed beverages, or to permit any liquor or malt or brewed beverages to be sold, furnished or given, to any person visibly intoxicated, or to any insane person, or to any minor, or to habitual drunkards, or persons of known intemperate habits." The cases were tried together, the charges against both defendants having arisen out of the same circumstances and at the same time. Defendants' motions in arrest of judgment and for new trial were denied and sentences were imposed upon the defendants, whereupon the instant appeals were taken by both defendants.

Defendant Randall argues that the above referred to act of 1953 is so vague and indefinite that it violates the due process clause of the 14th Amendment to the United States Constitution, which provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life,

liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It is undoubtedly the law that to comply with this requirement of the Constitution "a statute must be sufficiently certain and definite to inform the citizen of the acts it is intended to prohibit. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess as to its meaning and differ as to its application lacks the first essential of due process of law." 14 Am. Jur., Criminal Law, §22; *Com. v. Klick,* 164 Pa. Superior Ct. 449, 453, 65 A. 2d 440.

In support of his position, defendant Randall relies heavily on the case of *Musser v. State of Utah,* 333 U.S. 95, 68 S. Ct. 397, which involved a statute of the State of Utah prohibiting a conspiracy on the part of two or more persons "To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws . . . ." Thirty-three persons were charged under this act with conspiring to encourage and practice polygamy. The entire statute was stricken down for being too vague and unenforceable. The court, in its opinion, stated: "It is obvious that this is no narrowly drawn statute. . . . Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order." It is apparent that the *Musser* case is not authority for defendant's position that the phrase "corrupt the morals" is so vague and indefinite that it offends the due process clause of the Constitution. The statute in the *Musser* case related to acts deemed injurious not only to "public morals" but also to "public health . . . or to trade

or commerce or for the perversion or obstruction of justice or the due administration of the laws." In the case at bar we are concerned only with the word "morals" as related to children under the age of 18 years. This is a much more definite and restrictive area than that which was involved in the *Musser* case. We believe that the word "morals" has a definite and well-settled meaning. Defendant Randall also placed great reliance upon the case of *Hallmark Productions, Inc. v. Carroll*, 384 Pa. 348, 121 A. 2d 584. In this case the Pa. State Board of Censors had refused to approve display of a motion picture, "She Should'a Said No," involving the enticement of people into the sale and use of marijuana. The board, under this statutory authority, found that the film was "indecent and immoral" and, in the judgment of the board, tended to debase and corrupt morals. In the majority opinion of the Supreme Court the language of the statute was found to be vague and indefinite and therefore unconstitutional. In the majority opinion written by HORACE STERN, then Chief Justice, there will be found a review of the decisions of the Supreme Court of the United States on this subject.

The first case reviewed is *Joseph Burstyn, Inc. v. Wilson, Commissioner of Education of New York*, 343 U. S. 495. In that case a New York statute provided for the banning of a motion picture film if it or a part thereof was "obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime." The New York State Board of Regents determined that a certain film examined by them was sacrilegious and ordered a rescission of the license to exhibit it. An affirmation of that order by the New York Court of Appeals was reversed by the Supreme Court of the United States. The appellant there argued (1) that

the statute was a violation of the right of free speech and (2) that the term "sacrilegious" was so vague and indefinite as to constitute a denial of due process. The *Burstyn* opinion ends with a statement that "Since the term 'sacrilegious' is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us. We hold only that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious.'" Chief Justice STERN then reviews the following cases: *Gelling v. Texas,* 343 U.S. 960; *Winters v. New York,* 333 U.S. 507; *Superior Films, Inc. v. Department of Education,* and *Commercial Pictures Corp. v. Board of Regents of University of State of New York,* 346 U.S. 587. In all of these cases censorship under state acts was stricken down by per curiam opinions citing merely the *Burstyn* case. At the very end of his opinion in the *Hallmark* case (p. 358) Chief Justice STERN states: "It need hardly be added that even if all pre-censorship of motion picture films were to be held invalid this would not in and of itself affect the right to suppress objectionable films if exhibited, or to punish their exhibitor." (Emphasis added) In his dissenting opinion, Mr. Justice MUSMANNO, at p. 367, states: "After the decision of the Majority will have been handed down, those same shameful, shameless, degrading films may be projected anywhere in Pennsylvania publicly, the distributors and exhibitors being subject only, *after the showing, to the penalty provided under criminal law.*" (Emphasis added) We think it is clear that the Supreme Court in the *Hallmark* case intended to leave open the question of whether the legislature, by

the use of clear language, could make it a crime to commit any act which would corrupt or tend to corrupt the morals of our youth. In this connection the language of Mr. Justice MUSMANNO in his dissenting opinion in the *Hallmark* case, at p. 371, is significant. He said, "However, there is nothing vague or uncertain about the words, 'obscene,' 'indecent,' and 'immoral.' There is nothing ambiguous about 'debasement and corruption of morals.' Any citizen with a fairly good education, excellent character, good religious upbringing, social consciousness and devotion to the ideals of democracy, can pass with satisfactory results on whether certain motion pictures are moral and proper."

In the censorship cases the courts were concerned not only with the question of whether the language in the statute was so vague and indefinite as to constitute a denial of due process but also with that part of the Constitution which has to do with the right of free speech. In the present case we are not concerned with the freedom of speech provision. We are concerned only with the question of whether the statute which prohibits any acts which corrupt or tend to corrupt the morals of a child under 18 years of age is sufficiently clear and definite to advise the public of the proscribed conduct.

It is interesting to note that appellant Randall did not question the sufficiency of the evidence relating to the charge made against him. Without going into great detail, that evidence reveals that a party was held in defendant Randall's home, in the course of which some of the six minor children, whose ages ranged from 12 to 17 years, were served beer, whiskey and vodka and that the defendant Randall, clad only in the bottom of a pair of torn pajamas through which his private parts were visible to the minor children,

invited several of the minors to sit on his lap, kiss him and have intercourse with him.

It should be remembered that we are not here dealing with a moral concept about which our people widely differ; corrupting the morals of children is condemned throughout our land. According to common understanding, the term "morals" must be taken to refer to the moral standards of the community, the "norm or standard of behavior which struggles to make itself articulate in law." Cardozo, Paradoxes of Legal Science, pp. 17, 41, 42. "Sound morals as taught by the wise men of antiquity, as confirmed by the precepts of the gospel . . . are unchangeable. They are the same yesterday and today." We see no reason to retreat from those ideas. "We are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S. Ct. 679, 684, 96 L. Ed. 954. Our Federal and State Constitutions assume that the moral code which is part of God's order in this world, exists as the substance of society. The people of this State have acted through their legislature on that assumption. We have not so cast ourselves adrift from that code nor are we so far gone in cynicism that the word "immoral" has no meaning for us. Our duty, as a court, is to uphold and enforce the laws, not seek reasons for destroying them.

The comprehensive words of the statute, "Whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years" certainly convey concrete impressions to the ordinary person. The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

It is obvious that the mandates of the statute are salutary measures designed to protect children. "The ways and means by which the venal mind may corrupt and debauch the youth of our land, both male and female, are so multitudinous that to compel a complete enumeration in any statute designed for protection of the young before giving it validity would be to confess the inability of modern society to cope with the problem of juvenile delinquency." *State v. McKinley* 202 P. 2d 964, 967, 53 N.M. 106; *State v. Harris,* 141 S.E. 637, 105 W. Va. 165. The general language of the statute, therefore, is not a valid objection to it on constitutional grounds. Unless words of such seeming generality as "moral" and "immoral" were valid in statutes, government itself would become impossible. Manifestly, there can be no objection to the use, in a statute, of words like "corrupts the morals" or "tends to corrupt the morals of any child," which include many things, all of which are intended by the legislature to be covered; otherwise, there would be barred from statutory use such customary verbiage as "fraudulent," "due," "negligent," "arbitrary," "reasonable," etc.

It is not a valid criticism that such general moral standards may vary slightly from generation to generation. Such variations are inevitable and do not affect the application of the principle at a particular period in time: *Parmelee v. U. S.,* 72 App. D.C. 203, 113 F. 2d 729. The highest court in the land has recognized that the "Use of common experience as a glossary is necessary to meet the practical demands of legislation" and that the "requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." *Sproles v. Bin-*

*ford,* 286 U.S. 374, 393, 52 S. Ct. 581, 587, 76 L. Ed. 1167.

The constitutionality of similar statutes defining crimes in general terms has been upheld by many courts where the general terms used in the particular statute get precision from common standards of morality prevalent in the community.

The validity of statutes making it a crime to contribute to the delinquency of minors has been upheld in our own State and other jurisdictions: *Com. v. Jordan,* 136 Pa. Superior Ct. 242, 7 A. 2d 523; *Com. v. Wink,* 170 Pa. Superior Ct. 96, 84 A. 2d 398; *Com. v. Stroik,* 175 Pa. Superior Ct. 10, 102 A. 2d 239; *People v. Friedrich,* 52 N.E. 2d 120 (Ill.); *State v. Montalbo,* 110 A. 2d 572 (N.J.); *State v. Roessler,* 266 P. 2d 351 (N.M.).

The term "moral turpitude" has been held adequate to satisfy even the strict rule applicable to criminal statutes: *Jordan v. DeGeorge,* 341 U.S. 223, 232, 71 S. Ct. 703, 708. The term "good moral character" as used in the immigration and nationality laws has frequently been applied by the courts. The measure applied is the "common standard of morality" prevalent in the community: *Estrin v. U.S.,* 2 Cir., 80 F. 2d 105; or the "common conscience" of the community: *Johnson v. U.S.,* 2 Cir. 186 F. 2d 588, 590.

We are convinced that the statute here involved was couched in language sufficiently clear and definite to proscribe the conduct of defendant Randall.

Section 493, subparagraph 1, of the Liquor Code of 1951, supra, provides: "It shall be unlawful (1) For any licensee or the board, or any employe, servant or agent of such licensee or of the board, *or any other person,* to sell, furnish or give any liquor or malt or brewed beverages, or to permit any liquor or malt or brewed beverages to be sold, furnished or given, to . . .

any minor. . . ." (Emphasis added) The defendants argue that under the *ejusdem generis* rule, the words "any other person" refer to persons in the same class as those enumerated, i.e., licensees or board or any employe, servant or agent of licensee or the board, and that defendants do not fall within any of these classes. The doctrine does not require that the general term "or any other person" be limited in its scope to the persons specifically enumerated. "The doctrine of ejusdem generis is but a rule of construction to aid in ascertaining and giving effect to the legislative intent, where there is uncertainty, and does not warrant the court in subverting or defeating the legislative will by confining the operation of a statute within narrower limits than intended by the lawmakers. If, on consideration of the context and whole law upon the subject, and the purposes sought to be effected, it is apparent that the legislature intended the general words to go beyond the class specially designated, the rule does not apply." 50 Am. Jur., Statutes, §250; see also Endlich on Interpretation of Statutes, §410; *Com. v. Klucher*, 326 Pa. 587, 591, 193 A. 28. In this connection we quote with approval from the excellent opinion of President Judge BARTHOLD: "When the above tests are applied to the statute in question it is obvious that there is no uncertainty in the meaning of the words employed by the legislature.

"The purpose of the Liquor Code is set forth in sec. 104(a), 47 P.S. sec. 1-104, as follows: 'This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, health, peace and morals of the people of the Commonwealth and to prohibit forever the open saloon, and all of the provisions of this act shall be liberally construed for the accomplishment of this purpose.'

"Sec. 102, 47 P.S. sec. 1-102, defines the word 'person' to mean 'a natural person, association or corporation.'

"Secs. 491, 492 and 493, 47 P.S. secs. 4-491, 4-492, 4-493, set forth in separate paragraphs the 'Unlawful acts relative to liquor, alcohol and liquor licensees,' the 'Unlawful acts relative to malt or brewed beverages and licensees,' and the 'Unlawful acts relative to liquor, malt and brewed beverages and licensees.' We deem it noteworthy that the legislature carefully differentiated between 'persons', 'licensees', 'manufacturers', etc., in its enumeration of prohibited acts. In some instances all 'persons' are prohibited from doing certain things; in other instances the prohibition applies only to licensees of various types or their 'servants, agents or employes' etc. This is a clear indication that the legislature intended that some of the prohibitions were to apply to all persons while others were to apply only to 'licensees', or 'their servants, agents or employes'.

"It is particularly significant that sec. 493 sets forth 25 prohibited acts relative to liquor, malt and brewed beverages, and that the words 'or any other person' are included only in the sub-paragraph which makes it unlawful to sell, furnish or give any liquor or malt or brewed beverages to minors. It is significant also that minors are not the only class of persons to whom liquor or malt or brewed beverages may not be sold, furnished or given. Visibly intoxicated persons, insane persons, habitual drunkards and persons of known intemperate habits are similarly protected.

"We think that the legislature in using the words 'or any other person' deliberately selected these words in order to prohibit minors, visibly intoxicated persons, insane persons, habitual drunkards, and persons of known intemperate habits, from obtaining liquor,

malt or brewed beverages, whether by purchase or gift, from licensees or any other persons. The intention of the legislature to protect the classes of persons named is the underlying consideration. If we were to restrict this section of the Act to 'licensees' or their 'servants, agents or employes,' we would nullify the very purpose of the Act."

We are convinced that both defendants were properly convicted under this portion of the Liquor Code.

The defendants also complain as to the restriction imposed by the lower court on the cross-examination of Homer Smickley as to his arrest, plea of guilty and sentence on charges similar to those made against the defendants. Homer P. Smickley was called as a Commonwealth witness. He had been indicted on two counts, the first charged him with corrupting the morals of children and the other charged him with furnishing intoxicating beverages to minors. The charges arose out of the same set of circumstances as the charges against defendants. When the cases were called for trial the district attorney asked leave to "withdraw" the indictment on corrupting morals on the ground that the only evidence against Smickley was that he furnished liquor or beer. This motion was granted by the court. On examination by the district attorney, Smickley admitted that he was an inmate of Northampton County Prison on a parole violation and that he had pleaded guilty to a liquor violation in connection with the Randall case. When defendants' counsel attempted to cross-examine Smickley to show that he was also charged with "corrupting the morals" and that the charge had been withdrawn, and to question him on the circumstances under which the charge had been withdrawn, the court sustained objections to the cross-examination. It might have been better if the lower court had permitted a wider cross-

examination. In *Com. v. Mulroy*, 154 Pa. Superior Ct. 410, 416, 417, 36 A. 2d 337, we said: "Of course, if the witness is under indictment for the same crime, or for a crime growing out of, or closely related to, the very offense for which the defendant is being tried, so as to form a part of the same occurrence or transaction, it is proper for the jury to know it, as bearing on the witness's interest in the immediate matter. . . . 'When the co-indictee testifies for the accused, his situation here also may be considered as tempting him to exonerate the other accused and thus help towards his own freedom': 3 Wigmore on Evidence (3d Ed.), §967. So, too, if the witness, thus under indictment, testifies for the Commonwealth, it may be that his testimony was biased because given under promise or expectation of immunity or leniency from the officers conducting the prosecution being tried: . . .; and the jury are entitled to know it." The questions and answers and comments of counsel in connection with the testimony of Smickley clearly portrayed to the jury the nature of Smickley's connection with the cases under trial so that the jury could not have been under any misapprehension as to Smickley's interest, possible bias or prejudice or that his testimony may have been given with expectation of immunity, clemency or leniency. Moreover, the jury was adequately instructed that it should be satisfied upon the point of the truthfulness of his testimony and "should carefully and closely scrutinize his testimony, accept it with caution, not only because of any interest that Homer Smickley might have but because his testimony is evidence from a corrupt source, in view of the fact that he was an accomplice and pleaded guilty to the charge." The court also pointed out in its charge how the testimony of Smickley was corroborated by other evidence if the jury should believe that evidence. We are, therefore, of the

opinion that the court's action constituted error in the abstract and that it is not sufficient to warrant a retrial where the conclusion is inescapable that this error did not influence the jury against the accused or deprive them of their right to a fair trial. *Com. v. Barnak,* 357 Pa. 391, 423, 424, 54 A. 2d 865; *Com. v. Linkowski,* 363 Pa. 420, 424, 70 A. 2d 278; *Com. v. Felgoise,* 129 Pa. Superior Ct. 74, 79, 194 A. 751; *Com. v. Oldham,* 178 Pa. Superior Ct. 354, 358, 115 A. 2d 895.

The judgments are affirmed and it is ordered that appellants appear in the court below at such time as they may be there called and that they be by that court committed until they have complied with their sentences or any part of them which had not been performed at the time the appeal was made a supersedeas.