With the exception of the above points, I join the Majority Opinion.

**PINNACLE HEALTH SYSTEM,**
**Petitioner**

**v.**

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 7, 2007.
Decided Jan. 16, 2008.
Reargument Denied March 14, 2008.

Richard C. Seneca, Etters, for petitioner.

Peter J. Garcia, Asst. Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, McGINLEY and PELLEGRINI, Judges.

OPINION BY Judge PELLEGRINI.

Pinnacle Health System (Pinnacle) appeals a determination of the Bureau of Hearings and Appeals (BHA) denying Medicaid reimbursement for service rendered to patients in Pinnacle's inpatient psychiatric unit because that care fell below accepted medical treatment standards because those patients were not examined daily by a psychiatrist.

Pinnacle is a hospital system that includes an acute inpatient psychiatry unit. Physicians are present in the inpatient unit seven days a week, and each morning a psychiatrist reviews a report on every patient, which is submitted by the charge nurses. The names of patients who wish to be seen by a psychiatrist, patients whom staff members believe should be seen by a psychiatrist, and patients that have been signed out by another psychiatrist to be seen, are placed on a list, and the list is given to the on-duty psychiatrist. All patients are not examined daily by a psychiatrist. Additionally, an internist makes rounds seven days per week. All practitioners in the unit may contact the on-duty psychiatrist with patient concerns.

In the inpatient unit, because the patients are suffering from acute psychiatric illness, many are placed on psychotropic medication. Such medication only shows its effects over time. During the initial period patients are placed on psychotropic medications, they are watched by professional staff to monitor their reactions. The staff team includes registered nurses, licensed practical nurses, nurse case man-

agers, social workers and mental health workers. Patients also receive group therapy daily, and group leaders report to the attending physician. Discharge determinations are made by the entire treatment team.

On August 16, 2007, the Department of Public Welfare's (DPW) Bureau of Program Integrity (BPI) issued a letter citation to Pinnacle alleging that several Medical Assistance (MA) patients' treatment fell "below accepted medical treatment standards"[1] because a psychiatrist did not examine them daily. The BPI found that daily visits by psychiatrists were the "accepted medical treatment standard" based on its review of medical treatment records from other psychiatric hospitals across the state, as well as guidelines in the American Psychiatric Association's publication entitled "Criteria for Short–Term Treatment of Acute Psychiatric Illness." Based on that determination, DPW denied Medicaid reimbursement to Pinnacle for patient treatment on days that a psychiatrist did not examine those patients.

Pinnacle appealed to the BHA. The parties agreed to take testimony on the issue of daily examinations by a psychiatrist in one case and incorporate that testimony into the other appeals.[2]

To establish that it was providing the appropriate level of medical care, Pinnacle called Ray Sharetts, O.D. (Dr. Sharetts), the medical director of inpatient psychiatric services. He testified that patients in Pinnacle's inpatient unit did not need to be seen by a psychiatrist on a daily basis because in providing its services, Pinnacle used a team treatment approach that made daily examination by a psychiatrist unnecessary. Under that approach, it was acceptable for registered nurses and medical internists to assess the patients' psychiatric needs because patients were in therapy daily and there was continued feedback to the patient's psychiatrist. This feedback further made it medically unnecessary for a psychiatrist to examine the patients daily.

To support its position that Pinnacle's care was below acceptable standards, DPW called one of its consulting psychiatrists, Edward DiCasimirro, O.D. (Dr. DiCasimirro), who testified that an acute inpatient psychiatric facility such as the one run by Pinnacle constituted the highest level of care available in psychiatry. Based on his own experience as a psychiatrist and on his review of the records of other acute inpatient psychiatric units, daily examination by a psychiatrist in those types of facilities was the medically accepted standard of care. Dr. DiCasimirro further noted that the American Psychiatric Association also recommends daily examinations by a psychiatrist for patients in an acute inpatient psychiatric unit.

■ Finding Dr. DiCasimirro credible and persuasive, the Administrative Law Judge (ALJ) who conducted the hearing recommended that the medically accepted standard of care for patients in an inpatient psychiatric unit was a daily examination by a psychiatrist. In December, the BHA issued an order and adjudication adopting the ALJ's recommendation and

---

1. 55 Pa.Code § 1101.75(a)(7) states in, relevant part, that "(a) An enrolled provider may not, either directly or indirectly, do any of the following acts: (7) Submit a claim ... for services ... which ... are below accepted medical treatment standards or not medically necessary."

2. Both parties agreed to stipulate that the proposed witnesses were expert witnesses with Pinnacle adding a proviso that DPW's witness had not practiced in an inpatient psychiatric unit for four years. (Reproduced Record at 21a.)

denying Pinnacle's appeal. Pinnacle then appealed to this court.[3]

■ Pinnacle first contends that the BHA determination should be reversed because the falling "below accepted medical treatment standard" language set forth in 55 Pa.Code § 1101.75(a)(7) is unconstitutionally vague as it fails to give notice that daily psychiatric examinations are required.[4] It argues that had DPW wanted to set daily psychiatric examinations as the medically accepted standard of care for psychiatric inpatients, it should have included that standard as part of its regulations regarding the care of psychiatric patients.[5]

■ Regulatory provisions, however, are not void for vagueness simply because the standard is general in nature provided it conveys a sufficient warning as to prohibited conduct when measured against common understanding and practice. *Cooper v. Department of Banking*, 720 A.2d 832 (Pa.Cmwlth.1998). In *Commonwealth v. West*, 270 Pa.Super. 301, 411 A.2d 537 (1979), a doctor was convicted of four counts of unlawfully writing prescriptions in violation of Section 13(a)(14) of The Controlled Substance, Drug, Device and Cosmetic Act of 1972, April 14, P.L. 233, 35 P.S. §§ 780–113(a)(14), which states:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\* \* \*

(14) The ... prescription of any controlled substance by any practitioner ... unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

He challenged his conviction contending that the provision was unconstitutionally vague because it contained no ascertainable standard of conduct. In rejecting that claim, the Superior Court stated:

In construing statutes couched in similarly comprehensive language, this court has dealt with claims of impermissible vagueness as follows:

"[If] the comprehensive words of the statute ... convey concrete impressions to the ordinary person ... [then] the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particu-

---

3. Our scope of review of a BHA order is limited to determining whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact were supported by substantial evidence. *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134 (Pa.Cmwlth.2006).

4. In Pinnacle's Reply Brief, it notes several cases—W07–1760–62 and W07–1766–67—that dealt with inpatient psychiatric unit patients who were not examined by a psychiatrist during the weekends. It argues that based on the decisions of the ALJ in those cases, we must reverse in this case. Each case, however, is unique. In those cases, the ALJ found that the care provider's expert

witness was credible and that DPW's expert witness was not credible; therefore, the ALJ decided that daily examinations by a psychiatrist were not the accepted standard of care. In the case before us, the ALJ, who is the ultimate finder of fact, made the opposite determination, and absent a clear abuse of discretion, this court will not disturb credibility determinations made by the finder of fact.

5. For example, 55 Pa.Code § 1151.64 requires a social evaluation of psychiatric inpatients, and such evaluation must be placed in a patient's medical records, and 55 Pa.Code § 1151.65 requires that each patient shall have an individual written plan of care established by a physician.

lar conduct is rendered criminal by it."

Applying these criteria, we are satisfied that the standards set forth in Section 13(a)(14) are easily understood by the community at large. Therefore, a physician who contemplates prescribing controlled substances should have little difficulty in deciding whether his intended course of conduct is violative of those standards.

*West,* 411 A.2d 537, 540, *citing Commonwealth v. Randall,* 183 Pa.Super. 603, 611, 133 A.2d 276, 280 (1957).

Similarly, in *Del Borrello v. Department. of Public Welfare,* 96 Pa.Cmwlth. 507, 508 A.2d 368 (1986), we rejected a claim that a mandate to preserve medical records to a "required standard" was unconstitutionally vague because there were no uniform professional standards of medical record keeping. Instead, we held that the regulation adequately set forth a sufficient standard for the maintenance of medical records, and a medical provider was charged with knowledge of DPW regulations.[6]

As in *West* and *Del Borrello,* the standard here of having to meet "accepted medical treatment standards" may be a general one, but it, nonetheless, provides sufficient notice to a care provider. It informs the provider that to be reimbursed for medical treatment rendered to MA recipients,[7] they have the obligation to ascertain what constitutes the accepted standard in the medical community and then comply with that standard.

■ Even if the regulation is not void for vagueness, Pinnacle contends that substantial evidence does not support BHA's determination because Dr. DiCasimirro's testimony was legally insufficient to support a finding that failure to examine psychiatric patients on a daily basis falls below the accepted medical treatment standards. First, Pinnacle argues that Dr. DiCasimirro's testimony was not sufficient because he had not performed inpatient psychiatric services for four years and, therefore, he does not possess the ability to render an expert opinion. However, Pinnacle itself stipulated that Dr. DiCasimirro was an expert, and the weight that is to be given to that testimony is for the finder of fact to decide. *See Bindschusz v. Phillips,* 771 A.2d 803 (Pa.Super.2001).[8]

Pinnacle also argues that Dr. DiCasimirro's review of medical records to form his opinion of what constituted adequate medi-

---

6. At footnote 4 in *Del Borrello,* we noted that "a similar DPW regulation currently providing for restitution is found at 55 Pa.Code § 1101.83. DPW is also empowered to compel restitution where the medical provider has failed to follow the proper methods of documentation and the treatments 'are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are unneeded by the recipient.' " Section 1407(a)(6) of the Public Welfare Code (Act), Act of June 13, 1967, P.L. 31, added by, Act of July 10, 1980, P.L. 493, *as amended,* 62 P.S. § 1407(a)(6).

7. Pinnacle also argues that DPW committed an error of law when it determined that inpatients required a daily examination by a psy-

chiatrist because a daily exam was not required by DPW or federal regulations. What this contention ignores is that there is no requirement that DPW take on the task of articulating what is the acceptable level of care for every type of disorder.

8. As a psychiatrist, Dr. DiCasimirro had the competency and ability to testify as to the medically acceptable standard of care. DPW notified all practitioners participating in the MA Program that the appropriateness of services provided under the MA Program would be determined by a review of medical professionals in the same field of practice, and such professionals would be considered to be peers. *See* Pennsylvania Bulletin Vol. 13, No. 47, p. 3655.

cal treatment was improper for several reasons. First, it contends that Rule 703 of the Pennsylvania Rules of Evidence[9] only allows the use of medical records "pertaining to a patient whose care is at issue and not to other charts the physician may have read beyond the scope of the case." (Pinnacle's Brief at 19.) Ignoring that the Pennsylvania Rules of Evidence do not apply to administrative proceedings,[10] Rule 703 does not place any such limits on an expert in forming an opinion; it only requires that the facts or data upon which an expert bases an opinion be of a type reasonably relied upon by experts in the field. *See Gunn v. Grossman,* 748 A.2d 1235 (Pa.Super.2000).

Pinnacle then argues that Dr. DiCasimirro's review of medical records from other inpatient facilities was not sufficient to form an opinion of the appropriate level of care because it is the expert's contemporary knowledge of the medical issue that establishes his competency to render an opinion as to the appropriate level of care. To the contrary, ascertaining the level of care provided in other institutions is relevant in deciding what is the "accepted medical treatment standard." In any event, Dr. DiCasimirro's opinion of what was appropriate medical treatment was based on more that just the review of those records; it was also based on his education and experience as a psychiatrist for numerous acute inpatient facilities.

■ Pinnacle's final argument advances the claim that its own expert witness was more credible than DPW's expert. How-

ever, as we have stated repeatedly, credibility determinations are solely within the discretion of the ALJ, which we may not disturb on appeal. *1st Steps International Adoption, Inc. v. Department of Public Welfare,* 880 A.2d 24 (Pa.Cmwlth.2005); *Mihok v. Department of Public Welfare,* 135 Pa.Cmwlth. 265, 580 A.2d 905 (1990).

Accordingly, for the foregoing reasons, the order of the BHA is affirmed.

## ORDER

AND NOW, this 16th day of January, 2008, the order of the Department of Public Welfare, Bureau of Hearings and Appeals, is affirmed.

---

9. Pa. R.E. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

10. Under the Administrative Agency Law, Commonwealth agencies shall not be bound by the technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received. 2 Pa. C.S. § 505.