J-S68014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYRONE DINKINS | |
| Appellant | No. 2906 EDA 2013 |

Appeal from the Judgment of Sentence September 23, 2013
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0006575-2012

BEFORE: ALLEN, J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:              **FILED NOVEMBER 14, 2014**

A jury found Tyrone Dinkins, a schoolteacher, guilty of two counts of corruption of minors[1]. On each count, the court sentenced Dinkins to time served to 12 months' imprisonment followed by three years' probation. The sentences ran concurrently with one another. Dinkins filed a timely appeal, and both Dinkins and the court complied with Pa.R.A.P. 1925.

Dinkins contends in this appeal that (1) the trial court erred in denying his motion to suppress statements he made to police officers during their investigation into Dinkins' conduct, and (2) the corruption of minors statute is void for vagueness[2]. Finding no merit in either argument, we affirm.

---

[1] 18 Pa.C.S. § 6301.
[2] Dinkins raised a third issue in his Pa.R.A.P. 1925(b) statement that the trial court abused its discretion by failing to sever the charges against him. He has waived this issue by failing to argue it in his appellate brief.
*(Footnote Continued Next Page)*

Dinkins was employed at William Tennent High School as a music teacher and choral director. He was the instructor for various courses and singing groups, including chorus, chorale, digital music, and madrigals. He also ran the school's plays and musicals.

Eight female students in the music program accused Dinkins of engaging in inappropriate and sexual conduct during the 2011-12 school year. His alleged misconduct including groping the complainants' breasts or buttocks, and hugging them or making comments filled with sexual innuendo. To one female, S.S., he would silently mouth the phrases "olive juice" and "I want to vacuum". The former looked like "I love you", and the latter looked like "I want to fuck you." N.T. 7/16/13, pp. 85, 97, 107.

The school principal reported the students' complaints to the police. On the afternoon of June 28, 2012, Sergeant Carol Battistini and Detective John Schlotter of the Warminster Township Police Department visited Dinkins' home to speak with him about the complaints. N.T. 7/15/13, pp. 32-33 (suppression hearing)[3]. There were no criminal charges filed on that date. Charges were not filed until August 2012. N.T. 7/15/13, p. 55.

_(Footnote Continued)_ ────────────────

***Commonwealth v. Rykard***, 55 A.3d 1177, 1190 (Pa. Super. 2012) (appellant waived issue by neglecting to present appropriate argument and citation on appeal).

[3] On July 15, 2013, the court held a suppression hearing and denied the motion to suppress. Citations below to "N.T. 7/15/13" relate to the suppression hearing. Jury selection began on the afternoon of July 15th. On July 22, 2013, following a five-day trial, the jury rendered its verdict.

Dinkins was unaware that the officers were coming to his home.  N.T. 7/15/13, p. 36.  They were dressed in plain clothes with their badges displayed and their guns holstered in a visible location.  N.T. 7/15/13, p. 33.  Sergeant Battistini knocked at the door, and Dinkins answered.  N.T. 7/15/13, p. 34.  Dinkins appeared sober, understanding, communicative, friendly, open, and willing to speak.  N.T. 7/15/13, pp. 38, 56.  When Sergeant Battistini told Dinkins that the purpose of the visit was to interview him about the complaints, he responded that he was aware of the complaints and had an attorney for that.  N.T. 7/15/13, p. 34.  Sergeant Battistini asked to come inside the house to speak with Dinkins.  He declined to permit the officers inside the house but instead led them to a grassy area in a side yard outside his house.  N.T. 7/15/13, p. 35.  While standing on the grass, Sergeant Battistini asked Dinkins about the complaints, and he answered the questions and volunteered additional information.  N.T. 7/15/13, p. 38.  The conversation lasted between 45 minutes and one hour.  N.T. 7/15/13, p. 56.  The officers did not give Dinkins *Miranda*[4] warnings at any time during the interview.  N.T. 7/15/13, p. 29.  The record does not reflect the officers made any show of force at any time.

At no point did Dinkins say that (1) he would not talk to the officers without an attorney, (2) he wanted his attorney present, or (3) he did not

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

want to talk any further.  N.T. 7/15/13, pp. 42-43, 49, 52, 53.  Midway through the conversation, Dinkins' wife ventured outside the house and walked over to where Dinkins was speaking with the officers.  Dinkins told her to go back inside the house and added that the conversation would not last much longer.  N.T. 7/15/13, p. 45.  Dinkins' wife walked back inside the house, and the conversation continued.  N.T. 7/15/13, p. 45.

During the conversation, Dinkins stated that he is flirtatious and either jokes with his students or compliments them on their appearance to build up their self-esteem.  N.T. 7/17/13, pp. 29-30, 37.  He admitted to mouthing the phrases "olive juice" and "I want to vacuum" but said he just intended them to be jokes.  N.T. 7/17/13, p. 31.  He admitted to demonstrating unhooking S.S.' bra but denied touching her breasts.  N.T. 7/17/13, p. 33.  He acknowledged asking S.S. about going to the "dark side" but claimed it was merely a reference to an African-American student who liked her.  When asked if he ever gave "purple nipples" or "titty twisters" (twisting someone's nipple), Dinkins told the officers that students sometimes gave them to him, and that he only gave them as "payback".  He also indicated that he had only touched one female student's nipples.  N.T. 7/17/13, pp. 34-35. Dinkins also admitted pinching students and touching one female student's buttocks but compared it to a coach slapping a player's behind.  N.T. 7/17/13, p. 31.  He acknowledged an incident with C.S. in which he told her he had a dream about her and then hugged and kissed her on the neck.  In describing it to the officers, Dinkins teared up and said that the kiss had been a "mistake".

He denied purposely touching C.S.' breasts during this incident, but acknowledged that he may have touched them accidentally since they were so large. N.T. 7/17/13, pp. 35-36, 46.

After Sergeant Battistini concluded her questioning, Detective Schlotter asked Dinkins to come to the police station to provide a written statement. N.T. 7/15/13, p. 54. Dinkins indicated he would not be comfortable going to the station without an attorney. N.T. 7/15/13, p. 54. Detective Battistini "said to [Dinkins], well, he could write one here [in his yard], and he declined." N.T. 7/15/13, p. 54. Detective Schlotter asked to see Dinkins' cellphone. Dinkins walked inside his house to retrieve the phone but did not permit the detective to come inside with him. N.T. 7/15/13, p. 54. When Dinkins returned with the phone, Sergeant Battistini informed him that he was not being arrested today. N.T. 7/15/13, p. 55. Sergeant Battistini and Detective Schlotter left Dinkins' home without arresting Dinkins or bringing him to police headquarters. N.T. 7/15/13, p. 56.

The court entered findings of fact and conclusions of law denying Dinkins' motion to suppress. At the conclusion of trial, the jury deliberated on the following counts: two counts of unlawful contact with minors with respect to S.S. and A.J.; four counts of corruption of a minor as to S.S., A.J., A.O., and A.S.; four counts of indecent assault as to S.S., A.J., C.S., and K.T.; and six counts of harassment as to S.S., A.J., A.O., C.S., E.P., and A.P.

The jury found Dinkins guilty of corruption of a minor as to S.S. and A.J. The jury deadlocked on the indecent assault charge with respect to C.S. and acquitted Dinkins on the remaining counts.

As stated above, Dinkins' first argument on appeal is that the trial court erred in denying his motion to suppress.  Our standard of review in addressing a challenge to the denial of a suppression motion is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010).

Dinkins contends that his conversation with the police officers was a custodial interrogation, and that his statements during this conversation must be suppressed due to the officers' failure to provide *Miranda* warnings. We disagree.  This Court recently observed:

> It is a fundamental precept enshrined in the United States Constitution that a suspect subject to a custodial interrogation by police must be warned that

he has the right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney. *Miranda*, 384 U.S. at 469, 86 S.Ct. 1602. If an individual is not advised of his *Miranda* rights prior to custodial interrogation by law enforcement officials, evidence obtained through the interrogation cannot be used against him. . .'[I]n order to trigger the safeguards of *Miranda*, there must be both custody and interrogation. Statements not made in response to custodial interrogation are classified as gratuitous and are not subject to suppression for lack of *Miranda* warnings.'

In deeming an interaction to be a custodial interrogation, 'the police officer's subjective intent does not govern the determination but rather the reasonable belief of the individual being interrogated.' *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280, 282 (1997). In *Zogby*, we affirmed the trial court's decision to suppress incriminating oral statements made by the appellee to a police officer, at the appellee's home, before *Miranda* rights had been administered. We agreed with the trial court that, under the circumstances, the situation equated to a custodial interrogation. Appellant relies on *Zogby* to assert that the encounter at his home with the officers constituted a custodial interrogation.

An individual is deemed to be in custody for *Miranda* purposes when he 'is physically denied ... his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.'…The court must consider the totality of circumstances, including factors such as 'the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.'

- 7 -

*Commonwealth v. Cruz*, 71 A.3d 998, 1003-04 (Pa. Super. 2013) (internal citations omitted).

We conclude that the trial court properly denied Dinkins' motion to suppress, since he was not in custody during the interview. The police officers appeared at Dinkins' home in plainclothes and with their weapons holstered. The officers did not display any force during the conversation or threaten or restrain Dinkins in any way. They asked Dinkins if he was willing to speak, and he voluntarily agreed. He appeared sober, his demeanor was open and friendly, and he volunteered information that the officers did not specifically request. Significantly, the interview took place on his own terms. He chose the location of the interview (the yard); he chose to exclude his wife from the interview; he chose not to allow the officers into his house; he declined the officers' requests to provide a written statement while standing in the yard; and he refused to accompany them to the station to provide a written statement. The interview was not overly long (45 minutes to one hour), and the officers left without arresting him. There was nothing coercive about the location of the interview, its length, or the officers' conduct during the conversation. In short, nothing about the circumstances of the interview would lead a reasonable person to believe that Dinkins' freedom was constrained in any way. Indeed, in circumstances more threatening than these, this Court has held that the defendant was not in custody. *See Commonwealth v. Mannion*, 725 A.2d 196, 202-03 (Pa.

Super. 1999) (defendant's statements inside her home to troopers investigating alleged theft of $200,000 from business that employed defendant as bookkeeper were not product of custodial interrogation, even though troopers became suspicious during interview and one trooper stood by defendant and stated in low voice that he thought defendant was lying, where troopers asked for defendant's permission to speak with her, defendant believed that troopers were neutral and could help explain situation to employers, troopers informed defendant that she was not required to speak with them and could ask troopers to leave at any time, defendant offered troopers tea or coffee, defendant moved about freely as she smoked cigarettes, defendant took telephone call during meeting, troopers did not search or restrain defendant, and troopers made no show, threat, or use of force).

Nor were the officers required to stop speaking with Dinkins when he indicated that he "had" an attorney in connection with the complaints against him. This statement did not mean that he was unwilling to proceed without his attorney present. *Commonwealth v. Hubble*, 504 A.2d 168, 175 (Pa. 1986) (every utterance of the word "lawyer" does not automatically erect a "cone of silence" around the accused and insulate him from all further police-initiated questioning and communication). Even if we construe this statement as a demand for counsel, the right to counsel under the Fifth Amendment only attaches if a suspect is in custody, which, as discussed

above, Dinkins was not. ***Commonwealth v. Sherwood***, 982 A.2d 483, 500 (Pa. 2009) ("one cannot anticipatorily invoke the Fifth Amendment right to counsel. . . Since Appellant was not in custody when he made his statement about a lawyer, his alleged invocation of his right to counsel had no Fifth Amendment effect and thus police had no obligation to provide him with counsel, or to desist from interviewing him until they provided him with counsel").

In his second argument on appeal, Dinkins asserts that the corruption of minors statute, 18 Pa.C.S. § 6301, is void for vagueness. Dinkins has waived this issue by failing to raise it prior to trial, during trial or in post-sentence motions. ***Commonwealth v. Diodoro***, 970 A.2d 1100, 1104 n. 5 (Pa. 2009) (defendant waived argument that possession of child pornography statute was unconstitutionally vague by failing to raise this issue in trial court).

Even if Dinkins preserved this issue for appeal, he still would not prevail. We held in ***Commonwealth v. Randall***, 133 A.2d 276 (Pa. Super. 1957), that virtually identical language in 18 Pa.C.S. § 4532, the predecessor statute to section 6301, was not void for vagueness[5]. ***Randall*** held as follows:

_____

[5] ***Compare*** 18 P.S. § 4532 ("Whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years…is guilty of a misdemeanor") ***with*** 18
*(Footnote Continued Next Page)*

The comprehensive words of the statute, 'whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years' certainly convey concrete impressions to the ordinary person. The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

It is obvious that the mandates of the statute are salutary measures designed to protect children. 'The ways and means by which the venal mind may corrupt and debauch the youth of our land, both male and female, are so multitudinous that to compel a complete enumeration in any statute designed for protection of the young before giving it validity would be to confess the inability of modern society to cope with the problem of juvenile delinquency.'…The general language of the statute, therefore, is not a valid objection to it on constitutional grounds. Unless words of such seeming generality as 'moral' and 'immoral' were valid in statutes, government itself would become impossible. Manifestly, there can be no objection to the use, in a statute, of words like 'corrupt the morals' or 'tends to corrupt the morals of any child,' which include many things, all of which are intended by the legislature to be covered; otherwise, there would be barred from statutory use such customary verbiage as 'fraudulent,' 'due,' 'negligent,' 'arbitrary,' 'reasonable,' etc.

It is not a valid criticism that such general moral standards may vary slightly from generation to generation. Such variations are inevitable and do not affect the application of the principle at a particular period in time…The highest court in the land has recognized that the 'use of common

_(Footnote Continued)_ ─────────────────

Pa.C.S. § 6301(a)(1) ("Except as provided in subparagraph (ii), whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age…commits a misdemeanor of the first degree").

experience as a glossary is necessary to meet the practical demands of legislation' and that the 'requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.'…

The constitutionality of similar statutes defining crimes in general terms has been upheld by many courts where the general terms used in the particular statute get precision from common standards of morality prevalent in the community.

The validity of statutes making it a crime to contribute to the delinquency of minors has been upheld in our own State and other jurisdictions...

The term 'moral turpitude' has been held adequate to satisfy even the strict rule applicable to criminal statutes… The term 'good moral character' as used in the immigration and nationality laws has frequently been applied by the courts. The measure applied is the 'common standard of morality' prevalent in the community…or the 'common conscience' of the community...

We are convinced that the statute here involved was couched in language sufficiently clear and definite to proscribe the conduct of defendant Randall.

*Id*., 133 A.2d at 280-81 (internal citations omitted). ***Randall's*** pronouncement on this subject remains good law, and we would have followed it had Dinkins preserved this issue for appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/14/2014