J-S07019-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GAVIN JOSEPH CERCO | |
| Appellant | No. 895 MDA 2013 |

Appeal from the Judgment of Sentence of April 17, 2013
In the Court of Common Pleas of Lackawanna County
Criminal Division at No.: CP-35-CR-0000844-2012

BEFORE:  MUNDY, J., WECHT, J., and FITZGERALD, J.[*]

DISSENTING MEMORANDUM BY WECHT, J.:     **FILED NOVEMBER 26, 2014**

Gavin Cerco wears women's clothes.  The learned Majority professes to excise this fact from its consideration of Cerco's challenge to the sufficiency of the evidence offered in support of his corruption of the morals of a minor conviction.[1,2]   To the extent that the Majority suggests that Cerco's preferences in dress should have no bearing upon whether his actions

_____

[*]     Former Justice specially assigned to the Superior Court.

[1]     18 Pa.C.S. § 6301(a)(1)(i).

[2]     *See* Maj. Mem. at 7 ("*We resist* [Cerco's] *attempt to frame the dispositive issue* in this case in terms of whether his cross-dressing interests, and his communication of those interests to V.M., satisfy the element of corrupting or tending to corrupt the morals of a minor.  Viewing the evidence in this case in the light most favorable to the Commonwealth as the verdict winner, we conclude that there are *other aspects* of [Cerco's] communications with V.M. that amply support the jury's verdict.") (emphasis added).

tended to corrupt the alleged victim's morals, I agree. Cerco was prosecuted not for an allegation of eccentricity in attire, which in this country is no crime. Cerco was prosecuted for an alleged violation of the Crimes Code.

The evidence that remains if we ignore (as I believe we must) the cross-dressing is insufficient to support Cerco's conviction. I am thus compelled to wonder whether Cerco's proclivity for wearing women's clothes actually is performing some unstated service in the Majority's consideration of Cerco's claim. The evidence presented in this case, even when viewed in the light most favorable to the Commonwealth, fails to amount to proof beyond a reasonable doubt. Because the Majority holds otherwise, I respectfully dissent.

In the spring of 2012, Cerco, who was twenty-four years-old at the time, volunteered as an assistant coach for the boys' baseball team at Abington Heights Middle School in Abington Township, Lackawanna County. That year, V.M., who was twelve-years-old at the time, became the only girl on the team. Cerco quickly took an interest in V.M., treating her more cordially and interacting with her more than the other coaches.

On March 28, 2012, Cerco contacted V.M. through the popular internet communication service Facebook. Even though individual communication with a player or a student was prohibited by school district policy, Cerco nonetheless sent V.M. a "friend request" via Facebook. After V.M. confirmed that the request came from Cerco, she accepted it. Once the two became

"friends" on Facebook, a series of communications ensued between them that became the basis for the corruption of minors charge for which Cerco eventually was convicted.

Notably, the Majority elects to summarize the Facebook conversations that occurred between Cerco and V.M., a device that allows the Majority to isolate only the most damning portions of those conversations. A one paragraph summary of several days of messages in simply insufficient to allow for analysis of Cerco's intentions, and to permit contextualized assessment of whether his statements tended to corrupt V.M.'s morals. Indeed, to limit our discussion to a one paragraph summary is to circumscribe our role as an evaluating court, and restrict our ability to review not only the quantity of the evidence presented by the Commonwealth, but also the context within which certain critical statements were made. The only way properly and effectively to consider a claim such as the one raised by Cerco is to evaluate the entirety of the interactions. Thus, I set forth here *verbatim* the entirety of the conversations that were presented to the jury at trial:

**March 28-29, 2012:**

Cerco:    Did you do your planks? Oh, and don't tell anyone, I used to have pink socks like yours. Hahaha. I need comfortable socks, so I bought a bunch of women's light – like light blue, pink, yellow, purple, and some others. Just don't tell anyone. Hahaha. I noticed

you don't wear your yoga pants[3] anymore to practice. Were they too uncomfortable while fielding? And keep up the good hitting. You can use my bat the next time you hit if you want, cause the other bat is still too big for you.

V.M.: Haha, yes, I did my planks. Also, I've just not worn my yoga pants in a while. Lol. Oh, don't worry, I won't tell anyone about your socks. Haha.

Cerco: Haha, and I only have blue ones left. But thanks about not telling anyone and focus in school, remember that.

V.M.: No problem, and I will, haha.

Cerco: You're lucky you didn't go today. It was really cold. I needed leggings,[4] yoga pants, and sweatpants to be warm, but I only had sweatpants, haha. Good luck tomorrow. How's your leg doing?

V.M.: Haha, thanks, and a lot better. I did some stretches and planks and my mom bought some cream thingy that she put on my leg.

Cerco: That's good. Keep working it and it will get better. Also, warm baths work most of the time also. You do any sit-ups?

Cerco: Oh, and also don't tell anyone this, but I got yoga pants on now. Haha. They are comfortable, but I can't wear them anywhere unless it's for Halloween. Oh, before practice, if you want, we can do short hops for fielding, if you want to.

---

[3]  V.M. described yoga pants as "stretchy black pants" that she frequently wore to baseball practice. Notes of Testimony ("N.T."), 1/22/2013, at 85.

[4]  V.M. described leggings as "a tight-fit pair of pants that usually stretch a lot. They usually are tighter on the calf as opposed to yoga pants that would be wider." N.T. at 101.

V.M.:     Haha, I won't tell anyone.  And yes, I did do sit-ups today.  Also, it would be helpful if I could do short hops cause I'm kind of bad at them, haha.

**March 30, 2012:**

Cerco:     I'll help you with the short hops before practices when we have a ball.

V.M.:     Okay.  Thanks.

Cerco:     How was your play?[5]  And I'm wearing yoga pants.  You should see them.  I got a pic I can show you, if you want to.  You would like the pants.  Haha.  I need to get my own pair.  Where's a good place to get them besides Victoria's Secret?

V.M.:     Haha, my play went really well.  I got a standing ovation.  Haha.  Also, I got some yoga pants from Kohl's that were nice.

Cerco:     Nice job on the play, and I'll check Kohl's.  Is that where the ones you wore to practice are from?  But those are probably juniors, right?  I can fit into smalls and mediums.  And other girls' clothes are, like, larges or extra larges for juniors and medium or large for women.  I was a girl for a play in college, and I wore brown leggings with a tan long shirt that was tight and wore it as a dress with brown high-heeled boots to class one day.  Then for the play I wore black leggings with black high-heels and light blue and white with some black in a flowered dress, so comfy, haha.  If only I could wear some stuff like that out, but I can't.  You're lucky you can wear girls or men's clothes, haha.

Cerco:     I like your yoga pants.

V.M.:     Haha, yeah, and thanks.

---

5     V.M. played the role of Rizzo in the middle school's rendition of "Grease."

Cerco: Haha, you're welcome. Don't tell anyone this, but some time pick an outfit for me to try on, and I will, and then I'll show you a pic of it. I mean anything. I wore leggings before, you know, about the yoga pants, and everything else you can think of, haha. Just don't tell anyone. But at least at practice, if you want to talk about clothes or something, I'll listen and probably give you my opinion, haha.

V.M.: Okay, haha, I won't say anything.

Cerco: Haha, all right, thanks. You got the email about the game tomorrow, right?

V.M.: Which one?

Cerco: About the Tunkhannock game if it's cancelled.

V.M.: Oh, yeah, I got that.

Cerco: All right. Hey, what's the most popular outfit or style to wear nowadays?

V.M.: Not sure, haha. I don't pay attention to fashion. I'm all about sweats, haha.

Cerco: Haha. So you don't wear leggings or anything?

V.M.: No, not really.

Cerco: I don't care. Oh, and we need to get you doing some long toss once in a while.

V.M.: Okay, yeah, I need to build up some more arm strength.

Cerco: That's how you can do it, but we can start short and work your way back.

V.M.: Okay, thanks.

Cerco: Welcome. If it's on a day we don't have anything, just tell me. Your parents can take you to the high school and stay also and you can hit, work on fielding, and throwing.

V.M.: All right.

Cerco: And shouldn't you be in bed by now?

V.M.:   I should, haha.

Cerco:  You probably should.  I'll be playing PS-3 for a little or watching a movie, haha.

V.M.:   Okay, haha, I'll get some shut-eye, haha.

Cerco:  Good.  So then you'll be rested for the game.  Which one are you, the first or second?

V.M.:   I'm the one at 1 p.m.

Cerco:  All right, that's the first one, I think, right?  Haha.

V.M.:   I think, haha.

Cerco:  Haha, all right.

## March 31, 2012:

Cerco:  Nice voice you got there.  Keep going and practicing with singing if you like it.

V.M.:   Thanks, haha.

## April 1-2, 2012:

Cerco:  Welcome.

Cerco:  I'm getting my own yoga pants.  And what color band should I get?  And anything else you think I should get.  And where do you get your colored socks from?

V.M.:   Nice.  And I like to wear ones with a blue band usually, but that's just my opinion.  My mom got socks from Dicks Sporting Goods, I think.

Cerco:  I'll get the blue band.  And then the other pair, where do you get yours?  And you should wear the ones with the blue band.  I only saw an all-black pair.  I need more colored socks or printed ones. You got any ideas?  And what color leggings?

## April 3, 2012:

V.M.: I got mine at Kohl's and Marshalls, and I think one pair at Dick's Sporting Goods. For the leggings, whenever I do wear them, I usually wear black.

Cerco: All right. I'll go there and Victoria's Secret. They are comfy. I'm a small size and medium for yoga pants and a size small for leggings. Probably should be medium. How did the game go?

V.M.: It went well. The other team wasn't that good, haha.

Cerco: Haha. Did you get any hits? Yoga pants, blue band today, that's what I am wearing. Just kidding.

V.M.: Haha, no, I got two walks and I can't go today. I have Little League practice.

Cerco: At least you got on base. So since you're not going, I'll take your yoga pants with the color band. I'll wear them to practice. I'll fit in them, haha. Have fun at practice. It would be cool if I could try a pair, and/or if you don't have an outfit with leggings, I can try before I buy anything. Just don't tell anyone. And do you have heels that are 7 and a half or 8 or flats that would go with leggings or yoga pants?

V.M.: I have flats, but I don't have heels, haha.

Cerco: Haha, flats are nice. What size are they? Would I be able to borrow yoga pants of yours or an outfit and leggings with flats?

V.M.: They're, I think, a 7. I'm not sure. Haha.

Cerco: Not sure about me borrowing your stuff? Hahaha. And I can fit into most 7's if they are flats and sometimes sneakers also.

V.M.: Okay, haha. What do you need it for?

Cerco: I wanted to try some more stuff on to see if I like the style before I go out and spend money on stuff, because I used to go out and buy and then return it all. So I wanted to borrow a pair of your yoga pants with colored bands and leggings with flats and an outfit that goes with it, if you don't mind though.

| | |
|---|---|
| V.M.: | Oh, okay, and I know Marshall's sells nice yoga pants that are inexpensive. |
| Cerco: | All right.  Do you have any pairs from there that I can try and maybe from another place, and then an outfit with leggings and flats? |
| V.M.: | Yeah, I have a black pair, but it doesn't have a band on it. |
| Cerco: | Have any with a band also?  I'll take two pairs. Haha. |
| V.M.: | Haha, I don't know.  Most of my old ones I threw out or gave away that have a band. |
| Cerco: | Damn, so no more with bands that flip?  Do you have any outfits to go with flats and leggings? |
| V.M.: | I don't have leggings, so I don't know what goes with it.  Lol. |
| Cerco: | Like a long shirt as a dress, a skirt will go.  What about with stockings, anything with them? |
| V.M.: | I have, like, one skirt and it's not even mine.  Haha. I have this one sweater that I got from Rue 21 that's supposed to be long. |
| Cerco: | May I borrow both and yoga pants and flats, and if you have stockings, since I don't have leggings? |
| V.M.: | I guess so, yeah.  When would you want them? |
| Cerco: | Whenever you have practice again, just put it all in a bag that you can tie and just leave them at my car. I'll get them after practice.  I can give you my keys at the end of one of your practices. |
| V.M.: | Okay.  When would I get them back? |
| Cerco: | I can try them on in one night and bring them, put them in my car when I'm done if you need them right back. |
| V.M.: | Okay. |
| Cerco: | Would you need them back right away?  Just don't tell anyone. |

V.M.: Within a few days, after I give them to you, it's okay, because I usually wear flats to school and same with sweats. And don't worry, I won't.

Cerco: All right, I can do that.

V.M.: Okay.

Cerco: Do you have stockings to go with the skirt and sweater you told me you have?

V.M.: I don't think I do. I haven't worn stockings since my grandmother's funeral in 2008. Haha.

Cerco: All right. Well, if you have them, I'll take them, if I can.

V.M.: Okay.

Cerco: And sometime soon we can go hitting.

V.M.: Okay.

Cerco: How was practice?

V.M.: Good.

Cerco: That's good. How is your arm?

V.M.: Better than it was in the beginning of the season. I've gotten a lot more arm strength, I think.

Cerco: That's good.

V.M.: Yep.

Cerco: I had another question, but I'll hold off on it, haha. Maybe I'll ask someone older, haha, it deals with clothes though, like what to wear, haha.

V.M.: Okay. Haha.

Cerco: What shoes did you have on for the play?

V.M.: Flats.

Cerco: Nice. They are closed, right?

V.M.: Yeah.

Cerco: Nice.

V.M.: Yep.

Cerco: I was just wondering, what's the best thing to wear under the yoga pants and the skirt and sweater dress I'll be borrowing?

V.M.: With the sweats I usually wear compression shorts.

Cerco: All right. What about, like, yoga pants and the skirts? I guess what I'm asking is, what's the best underwear [to] wear? Haha. So compression shorts is with sweats and the yoga pants and the other stuff?

V.M.: Oh, haha. I don't know any underwear, lol.

Cerco: Haha, all right. I wasn't sure if any showed through with lines, or are, like, boy shorts, hipsters good to wear or a different kind, because I'm going to have to see if I can find a cheap pair for when I try your stuff on. If I take pics, may I show you? And you can tell me if I can get away with any of the outfits. Haha.

V.M.: Okay. Haha.

Cerco: Haha. You don't mind letting me borrow all of those clothes, do you? And remember, if you find stockings, put them in a bag. And just email me the day you will be bringing the clothes. You think boy shorts or hipsters, or what kind of women's underwear should I get for the clothes so I don't look like an idiot when I take the pictures? Haha.

V.M.: I have no idea what those words mean. Lol. I just buy clothes that I like. Haha.

Cerco: Haha, which words?

V.M.: Boy shorts and hipsters, haha.

Cerco: They are a type of women's underwear. Go to Victoria's Secret.com.

V.M.: I knew that, haha.

Cerco: And put in boy shorts and hipsters to see what they look like unless you already know, haha. And I'll see

- 11 -

for the skirt if I can get heels to try with them and take a picture.  What kind of skirt is it?  It is long or short?

V.M.:  Knee length, I think.

Cerco:  All right.  So it may be a little above my knees cause I'm a little taller, I think, which is cool though.  Thanks for letting me try on your stuff.  When I saw your yoga pants at practice I was like I've got to try those.  Haha.  Which ones are you letting me borrow?  Do you have extra pink socks or girly ones you don't need because I want some?  Haha.  Well, really, I would take any of your old – anything old of yours, haha, so you never have to throw anything away.  Haha.  And what positions would you like to learn to play for baseball?

V.M.:  Haha.  Most of my socks have holes in them.  Lol. And I have black Adidas sweats you can borrow.

Cerco:  On top of yoga pants and skirt and the sweater thing?  Where are those holes?  Haha, cause I like all your socks you wear to practice, haha.

V.M.:  I don't know and I'm not good with fashion and [the holes are] at the bottom.

Cerco:  If I can borrow the sweats and the yoga pants and the skirt and sweater dress thing with the flats and stockings, if you have them, that would be cool.

V.M.:  Okay.  Haha.

Cerco:  Sweet.  You should go to Rue 21.  Go to Rue 21 place and get some leggings for yourself with a light shirt as a dress for the summer with either heels or nice flats.

V.M.:  Okay.  Haha.  I'm not exactly a fashionable person. Lol.

Cerco:  Haha.  How come?  You look like you would be, and you look like you would be a cheerleader also.

V.M.: I don't know. I've always been a tomboy. I've never done anything like gymnastics or cheerleading, haha.

Cerco: Really? You don't look like a tomboy, though.

V.M.: Yeah, I am, lol.

Cerco: You in junior clothes now?

V.M.: Yes.

Cerco: All right. Let me show you some stuff for your fashion, haha.

V.M.: Lol. Okay.

Cerco: I used to sell a lot of clothes at Kohl's and shoes at Macy's.

V.M.: Nice, haha.

Cerco: [link to Jcpenny.com]. You can go with white heels, flats, or even nice green heels with this for the summer, like a summer dinner or something.

V.M.: All righty. Haha.

Cerco: I'm trying to find something for leggings for you. Haha.

V.M.: Okay. Haha. Well, I have to go. School tomorrow, blah.

Cerco: Haha. All right. I'll just email you some pics so you can see different outfits you can wear. And like I said, I'll take anything that you don't wear anymore if you need to get rid of it after I try on your stuff though.

Cerco: [links to items at victoriasecret.com].

Cerco: Tell me what you think. If you don't like, I'll try on other stuff, haha.

Cerco: Now, that I think of it, I probably won't fit into your clothes. You're probably an extra small or small in juniors. In juniors for me, I'm like a ten, I believe. That's like large or extra large, so I'll try to find

someone else for clothes so I don't stretch out yours, haha. But Friday, if you want to go hitting, tell me and I'll meet you up at the high school. You can hit and do some fielding, if you would like.

Cerco:    Unless you think I can fit into something of yours, like yoga pants, skirt, and flats.

Cerco:    Do you think I can fit into your yoga pants? I always change my mind, haha, so bring stuff if you think I can fit in it, haha.

Cerco:    If you're going to practice, bring the clothes. I'll try them. I should fit in them and the flats. Hey, did you find stockings? And just leave them under my car tied, and I'll be there early so I can put them in my car.

Cerco:    I'll be at your game tomorrow if you want to bring all the clothes in your bag inside another bag and I'll take them after the game.

N.T. at 84-115.

At first, Cerco's conversations and attendant requests caused V.M. to feel slightly uncomfortable, but she largely "didn't pay too much attention to them." *Id.* at 87. Despite her discomfort, V.M. "didn't mind him talking" about wearing women's clothes. *Id.* at 93. In the beginning, V.M. did not tell anyone about the conversations, because she felt that, as one of her coaches, Cerco had some influence over where and when she would get to play for the baseball team. However, as the conversations evolved, V.M.'s discomfort increased to a level where she decided to tell her former science teacher about them.

Shortly thereafter, Cerco was located and interviewed by Christopher Kolcharno, a detective with the Special Victims' Unit of the Lackawanna

County District Attorney's Office. Cerco admitted to Detective Kolcharno that he had discussed women's clothing with V.M.. Cerco stated that he has an interest in wearing women's clothing, and that his interest embarrasses him. Cerco stated that he discussed the clothing with V.M. because going to the mall to try on women's clothing made him uncomfortable, and because most stores would not permit him to try on women's clothing. Detective Kolcharno discovered photographs on Cerco's cell phone of him shirtless and wearing black women's yoga pants. Cerco admitted that he was planning on sending the photos to V.M., but never actually did so. V.M. confirmed at trial that Cerco never sent her the photos. Detective Kolcharno also found searches for cheerleader pornography on Cerco's computer, though Cerco never spoke to V.M. about pornography in any manner.[6] After the interview, Cerco was arrested.

At trial, Cerco testified that he began wearing women's clothing when he was a young boy by borrowing his sisters' clothing. As Cerco grew up, he would talk to his sisters about fashion and women's clothes. Cross-dressing became an outlet for Cerco: to soothe his anger and anxiety, Cerco chose women's clothing rather than drugs or alcohol. Cerco detailed his past experiences with retail stores, which often prohibited him from trying on women's clothes. He resorted to hiding the women's clothes within men's

---

[6] Cerco never was charged with any pornography-related offenses in connection with the search of his computer.

clothes that he took into the dressing room. Eventually, Cerco stopped attempting to try on women's clothes in public entirely. Cerco asserted that he did not wear women's clothing as a result of sexual desires; rather, he wears women's clothes because they are comfortable and relaxing.

Cerco admitted that he talked to other middle school baseball players on Facebook and that, when he saw V.M.'s profile photo on someone else's Facebook page, he decided to reach out to her because she had suffered an injury and he wanted to check on her status and ask her whether she was following through with the exercises that she needed to perform for rehabilitation. Even though Cerco started a Facebook discussion with V.M. to discuss her injury, he soon turned that conversation to women's clothing. Cerco testified that he had noticed that V.M. wore yoga pants to practice. He decided to broach the topic with her on Facebook because he believed that younger people tend to be more open-minded, which might make talking about women's clothing less uncomfortable for him. Cerco avowed that he was not trying to harm or upset V.M. in any way; he only wanted to talk to someone and borrow clothes from someone without the stress and embarrassment that typically attended his attempts to try on and purchase women's clothing in a retail store.

Cerco stated that he asked V.M. not to tell anyone about their conversations because he considered wearing women's clothing "a very private matter," and because "it's very difficult when people start coming up to you, making fun of you because you like women's clothes[,] and they

think that you need medicine." *Id.* at 149. Finally, Cerco testified that he had no intentions of ever being alone with V.M. Cerco explained that, as he had indicated in one of the Facebook messages, he invited players to practice individually with him, but only if those players brought a parent with them who would stay during the entire one-on-one practice.

Cerco asks this Court to determine whether the above body of evidence, much of which is omitted or ignored by the Majority, constitutes proof beyond a reasonable doubt that he corrupted, or tended to corrupt, V.M.'s morals. Our standard of review for a challenge to the sufficiency of the evidence is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Estepp*, 17 A.3d 939, 943-44 (Pa. Super. 2011) (citing *Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010)). Even applying this deferential standard of review, the evidence was insufficient.

A person is guilty of corruption of the morals of a minor if that person is above the age of eighteen and "by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court." 18 Pa.C.S. § 6301(a)(1)(i).

The Majority essentially pushes most of the trial evidence to the side. In concluding that the Commonwealth established Cerco's guilt beyond a reasonable doubt, the Majority chooses instead to focus its attention upon two facts of record: (1) Cerco's communications violated school policy; and (2) Cerco told V.M. not to tell anyone about their conversations. I will address each of these points in turn. First, however, I must discuss the two principal cases upon which the Majority relies, cases to which the Majority gives the same cursory treatment that it gives to the factual history of this case.

The Majority contends that Cerco's two above-listed acts suffice to constitute the crime of corruption of the morals of a minor based upon our decision in *Commonwealth v. Barnette*, 460 A.2d 1166, 1172-73 (Pa. Super. 2000). In that case, Barnette was convicted, *inter alia*, of corruption of the morals of a minor based upon the following events:

- 18 -

The package [containing 2.2 kilograms of marijuana] was shipped from Yonkers, New York to a Mike Costonis of 1404 East Lake Road, Erie, Pennsylvania. The package was received at the Griswold Plaza Branch of the United States Post Office. While at the post office a Postal Inspector noticed that the package emitted a strong odor of deodorizer, which raised the Inspector's suspicions as deodorizer is often used as a masking agent for illegal drugs. The Inspector contacted the City of Erie Police Department. Detective Mike Nolan and Detective Matthew Fisher responded to the call by the Inspector. As the package had already been delivered, the two detectives went to 1404 East Lake Road to investigate. At the residence, the Detectives met a juvenile, Aaron Ferrara, who stated that he had just signed for a package, which had been delivered for "Mike." The Detectives asked permission to enter the house to see the package, which was granted by Aaron Ferrara. Aaron Ferrara told the Detectives that "Mike" had told him to sign for the package and that it contained knick-knacks. When [Barnette] and co-Defendant, Shane Ferrara[,] arrived at the house, Aaron Ferrara identified [Barnette] as the person known as "Mike" who had instructed him to sign for the package. Detective Nolan asked [Barnette] if that package was his, and if so, whether [Barnette] minded if the Detective opened the package. [Barnette] denied he was Mike Costonis and denied any ownership interest in the package. [Barnette] stated that, since the package was not his package, therefore, he did not care if Detective Nolan opened the package.

*Id.* at 1169 (quoting Trial Court Opinion, 10/29/99, at 1-2). In rejecting Barnette's challenge to the sufficiency of the evidence, this Court held that "the conduct at issue involved Barnette asking a young man to sign for delivery of a package that he knew contained drugs." *Id.* at 1173. We further noted that Barnette's "duplicitous conduct," *i.e.*, lying to the minor about the contents of the package and tricking the minor into signing for the package, "offends the common sense of the community, as well as the sense of decency, propriety and the morality that most people entertain." *Id.*

- 19 -

The differences between **Barnette** and the present case are patent, and are so to such a degree that **Barnette** is obviously distinguishable. In **Barnette**, the offender fraudulently induced a minor into accepting a package containing a significant amount of marijuana. Although Barnette perpetrated two distinct acts upon the minor, there is no question that the driving factor in the case was Barnette's involvement of the minor in an illegal activity. Surely, the mere act of lying to the minor pales in comparison to asking him to receive contraband. By contrast, in the present case, no illegal activity occurred. Cerco neither lied to V.M., nor, more importantly, did he encourage, induce, or ask her to engage in any illegal activity. The simple fact that both cases involve two contested actions does not render one binding upon the other. Rather, the fact that Barnette engaged a minor in an illegal activity, while Cerco did no such thing, commands that the cases be distinguished, the Majority's suggestion to the contrary notwithstanding.

The Majority next relies upon **Commonwealth v. Slocum**, 86 A.3d 272 (Pa. Super. 2014), as support to uphold Cerco's conviction. In **Slocum**, a panel of this Court examined the essential elements of the crime of corruption of the morals of a minor. In that case, Slocum, a Catholic priest, formed a relationship with a thirteen year-old boy who lived next door to the church's rectory. **Id.** at 273. Slocum equipped a room in the rectory with a pool table, ostensibly offering the place as a lounge for neighborhood teenagers. The boy who lived next door started spending significant

amounts of time in the lounge with Slocum. Additionally, Slocum provided the boy with popular electronics such as an iPhone and a laptop computer. Slocum began communicating with the boy through text messages and Facebook. *Id.* at 274.

The boy began lying to his mother about his whereabouts and about the amount of time that he was spending with Slocum. On one occasion, the boy snuck out of his house in the middle of the night to go spend time with Slocum in the rectory lounge. On another occasion, the boy skipped school to spend the day with Slocum. Slocum knew that the boy was supposed to be in school, but did not contact the school or the boy's mother. As a result of the boy's defiant behavior, his mother took away all of the electronic devices that Slocum had given him and banned him from spending time in the rectory. The boy's mother also sent a letter to Slocum informing him that the boy was not allowed in the rectory, and instructing Slocum to contact her if the boy told Slocum that he had his mother's permission to be in the rectory. *Id.*

Nonetheless, the boy continued to contact Slocum through the use of a second computer that Slocum had given him. Slocum told the boy that he missed him, and that he did not approve of the mother's punishments of the boy. Shortly thereafter, because of his increasingly deviant behavior, the boy was sent to live with his grandparents. One day, the boy did not return to the grandparents' home after school. Instead, he went to visit with Slocum, despite his mother's prohibition against doing so. Again, Slocum

did not contact the boy's mother. To the contrary, when the mother called Slocum, he lied to her, telling her that he had not been home all day long. However, by the time that Slocum concocted the lie, the boy had returned to his grandparents' home and confessed that he went to see Slocum. The mother called Slocum for the second time that day, and Slocum still refused to admit that he had seen the boy. The mother again told Slocum that he was to have no contact with the boy. *Id.*

Shortly after this incident, the boy was caught sneaking over to see Slocum. The mother confronted Slocum for the third time and told him to stay away from the boy. She also told Slocum that she was going to contact the bishop of the church. The next morning, the mother found multiple text messages between Slocum and the boy, which prompted her to call the police. Slocum admitted to the police that he allowed the boy in his residence without the mother's permission, that he concealed the boy's presence from the mother, and that he aided the boy in deceiving the mother. *Id.* at 274-75.

Slocum was convicted by a jury of concealment of the whereabouts of a child, 18 Pa.C.S. § 2909(a), and corruption of the morals of a minor. On appeal, Slocum challenged, *inter alia*, the sufficiency of the evidence offered to prove him guilty of corruption of the morals of a minor.

In rejecting Slocum's sufficiency challenge, this Court set forth what amounts to a comprehensive survey of what must be proved by the

Commonwealth to sustain a conviction of corruption of the morals of a minor:

Our Supreme Court has explained:

The Commonwealth need not prove that the minor's morals were actually corrupted. Rather, a conviction for corrupting morals will be upheld where the conduct of the defendant tends to corrupt the minor's morals. The statute speaks to conduct toward a child **in an unlimited variety of ways** which tends to produce or to encourage or to continue conduct of the child [that] would amount to delinquent conduct.

*Commonwealth v. Mumma*, 414 A.2d 1026, 1030 (Pa. 1980) (citations and quotation marks omitted) (emphasis added).

Similarly, this Court has explained that:

The statute requires [that] the knowing, intentional acts of the perpetrator **tend** to have the effect of corrupting the morals of a minor.

This court has visited the question of what constitutes "corruption" of a minor's morals before. In *Commonwealth v. Decker*, 698 A.2d 99, 101 (Pa. Super. 1997), we held that actions that tended to corrupt the morals of a minor were those that "would offend the common sense of the community and the sense of decency, propriety and morality [that] most people entertain."

*Commonwealth v. DeWalt*, 752 A.2d 915, 918 (Pa. Super. 2000) (emphasis in original, one citation omitted).

*Decker* had explained that:

In deciding what conduct can be said to corrupt the morals of a minor, "'[t]he common sense of the community, as well as the sense of decency, propriety and the morality [that] most people entertain[,] is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.'" *Commonwealth v. Pankraz*, 554 A.2d 974, 977 (Pa.

Super. 1989) (quoting **Commonwealth v. Randall**, 133 A.2d 276, 280 (Pa. Super. 1957)). Furthermore,

> [c]orruption of a minor can involve conduct towards a child in an unlimited number of ways. The purpose of such statutes is basically protective in nature. These statutes are designed to cover a broad range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be proscribed, such statutes must be drawn broadly. It would be impossible to enumerate every particular act against which our children need to be protected. **Commonwealth v. Todd**, 502 A.2d 637, 635 n.2 (Pa. Super. 1985) (citing **Commonwealth v. Burak**, 335 A.2d 820 (Pa. Super. 1975)).

**Decker**, 698 A.2d at 101; **see also Commonwealth v. Barnette**, 760 A.2d 1166, 1173 (Pa. Super. 2000) (citing **Decker** for the above language).

This Court has long recognized that:

> It is obvious that the mandates of the statute are salutary measures designed to protect children. The ways and means by which the venal mind may corrupt and debauch the youth of our land, both male and female, are so multitudinous that to compel a complete enumeration in any statute designed for protection of the young before giving it validity would be to confess the inability of modern society to cope with the problem of juvenile delinquency. The general language of the statute, therefore, is not a valid objection to it on constitutional grounds. Unless words of such seeming generality as 'moral' and 'immoral' were valid in statutes, government itself would become impossible. Manifestly, there can be no objection to the use, in a statute, of words like 'corrupt the morals' or 'tends to corrupt the morals of any child,' which include many things, all of which are intended by the legislature to be covered; otherwise, there would be barred from statutory use such customary verbiage as 'fraudulent,' 'due,' 'negligent,' 'arbitrary,' 'reasonable,' etc.

**Randall**, 133 A.2d at 280 (some internal quotation marks and citation omitted).

* * * *

Furthermore, in **Decker**, this Court specifically held that there is no requirement of any underlying criminal activity in a corruption of minors charge. The **Decker** Court explained:

[W]hile it is true that generally a corruption of minors charge accompanies a more serious charge such as involuntary deviate sexual intercourse, statutory rape, indecent assault, etc., nowhere in the statute is there a requirement of such underlying criminal activity, nor will one find a prohibition against a charge of corruption of minors standing alone. Moreover, the statute states "by any act" not "by any criminal act." The fact that a corruption of minors charge is generally coupled with additional underlying criminal activity is more a reflection of the usual application of the statute than its legal precedent. We believe that if our legislators intended to require some underlying criminal activity as the basis for a corruption of minors charge, they would have written it into the statute.

**Decker**, 698 A.2d at 100.

**Slocum**, 86 A.3d at 277-79 (citations modified; footnotes omitted; emphasis in original). Ultimately, the panel majority held that corruption of the morals of a minor does not require a defendant to encourage a minor to commit a crime, a delinquent act, or a violation of probation, as was argued by the appellant. **Id.** at 277. To the contrary, our Court held that Slocum's acts of encouraging the boy to disobey and deceive his mother were sufficient to satisfy the statutory elements of the crime. **Id.** at 280-81.

To be sure, **Slocum** is closer to the facts of this case than is **Barnette**. And yet, **Slocum** is readily distinguishable as well. Slocum deliberately encouraged a minor to disobey a command by the boy's mother, an order that directly applied to the minor. Slocum's actions were designed

- 25 -

purposefully to encourage a minor to disobey prohibitions that were directly applicable to that minor. Instantly, Cerco's discussions with V.M. violated a policy that applied only to Cerco, not to V.M. in any way. There was no way in which V.M. could have violated the school policy, or could have been punished for anyone's violation of that policy. This distinction is analytically significant. The law requires us to focus upon whether an action tended to corrupt the morals of a minor. In **Slocum**, the defendant's actions tended to corrupt because the mother's prohibitions related to and applied directly to the minor. Here, the school policy applied only to Cerco. Thus, the cases are inapposite. I discern no cause to extend **Slocum** to a case with such distinguishable facts. The Majority's spare citation of **Slocum** certainly presents no justification for doing so.

Neither of these two precedents relied upon by the Majority supports the conclusion that Cerco's actions tended to corrupt V.M.'s morals. My research has produced no other cases that would support, even arguably, the conclusion reached by the Majority.

As I noted earlier, if we credit the Majority's avowal that Cerco's cross-dressing plays no part in its analysis, this case boils down to two evidentiary points: (1) an adult violating a policy applicable only to him; and (2) an adult asking a minor not to tell anyone about the contents of a conversation in circumstances where that conversation makes no reference whatsoever to any sexual act, offers no encouragement to the minor to do anything illegal, and contains no other element that is inherently immoral. That these two

points, standing alone, cannot suffice as proof beyond a reasonable doubt for the crime of corruption of minors is easily demonstrated through a few simple hypotheticals, in each of which we undeniably would be bound to conclude that the facts did not warrant a criminal conviction.

First, let us assume that a school has a policy that prohibits teachers from using their cellular telephones in a classroom, a policy that is limited to teachers only. One morning, an early arriving student walks into a classroom to find a teacher checking the previous night's football scores on his phone. The teacher immediately recognizes that he is in violation of the school policy, and asks the student not to tell anyone that the teacher had violated the school policy. Second, consider a school bus driver who is subject to a school policy requiring bus drivers to wear seat belts at all times. Students, of course, are not required to wear seat belts on the bus. Thus, the policy is applicable only to the bus driver. Nonetheless, on one morning, the bus driver forgets to wear the seat belt. When one student gets on the bus, she notices that the driver is not wearing the seat belt, and she tells the driver that he should be wearing his belt. The driver immediately instructs the student not to tell anyone about his violation of the policy. Finally, imagine a diabetic patient who is under strict orders from his physician to avoid candy that contains a high amount of sugar. That patient, unable to resist his sweet tooth, hides a Snickers bar in his pants pocket. When he thinks that no one is watching, he sneaks the candy bar from his pants and devours it. Unbeknownst to the patient at the time, his

grandchild has observed him eating the candy bar. When the patient realizes what the child has seen, he immediately instructs the child not to tell anyone, including family members or his physician.

In each of these scenarios, an adult violated a policy or prohibition that was applicable only to the adult, and then instructed a minor not to tell anyone about the violation. None of the actions involved encouraging the minor to engage in any illegality, inherently immoral activity, or anything implicating the adult's prurient interests. It cannot reasonably be argued that any of the adults' actions tended to corrupt the morals of the minors, or that any of these adults had committed a crime. Yet, each scenario involved the same factual construct as what occurred in the instant case.

This demonstration begs the question: what distinguishes these hypotheticals from the instant case? Of course, there can be only one answer: Cerco's communications discussed cross-dressing. There are no other facts offered by the Majority, or included within the factual record in this case, to suggest otherwise, or that arguably would support Cerco's conviction. It is admirable that the Majority announces its determination to resolve this case without reliance upon Cerco's sartorial proclivities, but my conclusion is inescapable. The evidence simply is insufficient. An unspoken reliance upon the cross-dressing evidence is the only thing that could tip this case over the edge for the Majority.

From the recitation in **Slocum**, it is clear that, for a conviction of corruption of the morals of a minor, it is immaterial in this case whether

V.M.'s morals actually were corrupted and whether any of Cerco's discussions or actions were criminal. Based upon this controlling precedent, the only inquiry that we need to make in this case is whether Cerco's discussions with V.M. **tended** to corrupt V.M.'s morals. To decide this question, it is necessary to consider whether Cerco's acts of discussing women's clothing with a twelve-year-old girl constituted behavior that "would offend the common sense of the community, as well as the sense of decency, propriety and the morality [that] most people entertain." **Slocum**, 86 A.3d at 277 (quoting **DeWalt**, 752 A.2d at 918; **Decker**, 698 A.2d at 101). For purposes of this appeal, I would assign no evidentiary value to Cerco's interest in wearing women's clothing. Although obviously atypical of a conversation conducted between a grown man and a minor girl, I cannot conclude that a conversation about cross-dressing tended to corrupt V.M.'s morals based upon our established legal standard. Hence, I would hold that the evidence was insufficient to sustain Cerco's conviction.

The concern implicit in the crime of corruption of the morals of a minor is the impact, or potential impact, that is left upon the minor as a result of the acts of the adult. In **Slocum**, the priest deliberately engaged in behavior that was designed to aid and to encourage the minor to deceive and defy the boy's mother. Deceit is a trait that tends to impact negatively upon the morals of a minor, and that offends the common sense of decency and propriety recognized in a reasonable society. In **Slocum**, and in other corruption of the morals of the minor cases, the defendant either caused or

- 29 -

attempted to cause the minor to engage in specific behaviors that society would deem immoral or offensive. That simply is not the case here.

Although uncommon, Cerco's cross-dressing is not criminal. Nor is it inherently immoral or decidedly destructive in such a way that merely discussing the behavior fairly can be said to tend to corrupt the morals of a minor. Candor compels me to acknowledge that a goodly number of people casually would characterize cross-dressing as a deviant activity. And perhaps some subset of those people are repulsed by such behavior, or reflexively would associate it with prurience, or even with perversion. But nothing in our law compels or even encourages this perception. Indeed, it is significant that the Commonwealth concedes that cross-dressing is "not a criminal or immoral act." Brief for the Commonwealth at 19.

It should go without saying that I am, and must be, fiercely protective of the children of our Commonwealth. The record in the case *sub judice* simply does not support any suspicion that these conversations, which lacked any hint of improper insinuation or importuning to immoral activities (after all, a girl can hardly cross-dress in her own clothing), were inherently corrupting. Even when many people might look askance at a given activity, in this instance cross-dressing, that alone cannot suffice, without more, to justify a conclusion that the activity is inherently immoral within the meaning criminalized by our corruption of the morals of a minor statute.

In today's popular entertainments, cross-dressing is portrayed occasionally, sometimes in a pejorative manner, and sometimes not. These

depictions are readily viewed in movie theaters and on prime-time television. Nothing in V.M.'s responses to Cerco at any point in their conversations suggested that she was unfamiliar or uncomfortable with the fact that some people enjoy cross-dressing. These considerations militate against a finding that cross-dressing is inherently immoral. Indeed, the Commonwealth concedes as much. *See* Brief for the Commonwealth at 19. The only "immorality" that the record could be argued to reveal is the mere fact of Cerco's cross-dressing; beyond broaching the topic of his own cross-dressing, Cerco neither said nor did anything to suggest or urge improper activity by V.M. Mere social eccentricity is not enough to bring this case within the ambit of our precedents upholding convictions for corrupting the morals of a child.

Even if cross-dressing could be characterized as deviant behavior, it is critically important that Cerco limited the behavior to himself. Indeed, unlike the typical corruption of the morals of a minor scenario, which often includes inducing a minor to use drugs, *see Commonwealth v. Goodyear*, 344 A.2d 672, 673 (Pa. Super 1975), engage in sexual activity, *see Decker*, 698 A.2d at 100, or disobey and deceive an authority figure, *see Slocum*, 274-75, Cerco never once encouraged V.M. to engage in any such behavior. Cerco merely discussed with V.M. various styles of women's clothing, the places where such clothing could be purchased, and the possibility of borrowing that clothing from V.M. It would bridge a chasm too wide to conclude that Cerco's discussion with V.M. about **his** desire to wear women's

clothing, standing alone, tended to corrupt **her** morals. Because Cerco did not encourage V.M. to engage in cross-dressing or to engage in any inherently deviant behavior, it would defy all logic and reason to hold that V.M.'s morals tended to be corrupted.

Because I find no principled basis upon which to conclude that cross-dressing is inherently immoral, or is behavior that would offend the common sense, decency, or propriety of a reasonable society in the year 2014, I cannot conclude that the mere discussion of such a topic automatically tends to corrupt the morals of a minor. Also, even if cross-dressing could be framed as taboo, and even if it could be said inherently to constitute at least deviant behavior, a position that the Commonwealth does not maintain, Cerco did not encourage V.M. at any point to engage in that behavior or in any related behavior that might violate societal norms. Finally, and not least, there is nothing whatsoever in the record to indicate that Cerco discussed these matters with V.M. to satisfy his prurient, as opposed to purely sartorial, interests.

I do not avoid the fact that Cerco asked V.M. not to disclose to anyone the content of their conversations. However, this fact alone does not convince me that Cerco's actions would tend to corrupt the morals of a minor. The record clearly indicates that Cerco asked V.M. not to disclose his cross-dressing, and their discussions about women's clothing, so as to avoid the stigma and embarrassment that he believed attaches to men who wear women's clothing. This point is missing from the Majority's analysis because

the Majority does not produce a full recitation of the factual record. Instead, the Majority opts to summarize the evidence in a manner that allows it to highlight and isolate only those facts which tend to support its conclusion. The context of Cerco's statements is conspicuously absent from the Majority's recitation. There is nothing inherently immoral about asking a person, even a minor, to keep an embarrassing secret such that doing so would tend to corrupt that minor's morals, particularly when the behavior in question is not inherently immoral. Thus, standing alone, the fact that Cerco asked V.M. not to tell anyone about his cross-dressing and their conversations about women's clothing does not, by itself, bring this case within the ambit of **Slocum**, or constitute sufficient evidence to sustain a conviction for corruption of the morals of a minor.

I note that Cerco had taken photographs of himself shirtless and wearing women's yoga pants. Although Cerco asked V.M. if she would look at photos of him wearing women's clothes (which photos he never sent her), nothing in the record suggests that Cerco was doing so for sexual or immoral reasons. The record that I have recited at length above gives every indication that Cerco was going to send the photos to V.M. for her opinion on how the clothing looked on him. In any event, Cerco never sent the photos to V.M., and there is no indication that she ever saw them. It would be nonsensical to conclude that photos which a minor never saw tended to corrupt that minor's morals. Furthermore, there is nothing inherently immoral in proposing to transmit photos for the above-stated reasons.

- 33 -

Viewing the evidence in the light most favorable to the Commonwealth, that evidence was insufficient to support the conclusion beyond a reasonable doubt that Cerco's actions tended to corrupt V.M.'s morals. For the criminal conviction to stand, it is not enough that some or even many might view Cerco's habits with derision or distaste. Although Cerco's choice of his audience for this discussion was questionable and in dubious taste, that choice was not criminal. Cerco's actions did not rise (or sink) to the level of behavior that reasonable people in today's society would deem to offend that society's common sense of propriety or decency as tending to corrupt the morals of a minor. Consequently, I would reverse Cerco's conviction, and I would vacate his judgment of sentence.

For these reasons, I dissent.